IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Docket. No. 20-mj-5666 (KMW) |
| | : | |
| JOHN MICHAEL MUSBACH | : | |

---

**DEFENDANT JOHN MUSBACH'S MOTION FOR DISTRICT COURT DE NOVO REVIEW OF MAGISTRATE JUDGE'S DENIAL OF DEFENDANT'S MOTION FOR PRETRIAL RELEASE**

---

BACKGROUND

Defendant JOHN MUSBACH, by his attorney, Rocco C. Cipparone, Jr., Esquire, hereby moves the District Court pursuant to 18 U.S.C. § 3145(b) and 18 U.S.C. § 3142, for revocation of the January 25, 2021 Order by United States Magistrate Judge Williams denying defendant's motion for release from custody, which motion was filed January 18, 2021 under docket entry 20, and for an Order releasing defendant on bond with the conditions outlined below.[1]

Magistrate Judge Williams conducted a hearing on defendant's motion on January 25, 2021, and thereafter entered an Order

---

[1] Defendant Musbach is charged in a criminal complaint filed August 10, 2020 with violation of 18 U.S.C. § 1958(a), the use of the internet with the intent that a murder be committed (none was committed). Docket Document 1 (Criminal Complaint). On August 20, 2020, the defendant had an initial detention hearing on a motion by the government, shortly after his arrest, after which hearing the Magistrate Judge detained the defendant. A.054 (08-20-2020 Order). The defense sought to order a transcript of that hearing but has been advised by the Deputy Clerk that a substitute deputy clerk filling in that day had a computer issue, the computer was wiped clean, and the recording is unrecoverable (thus no transcript can be prepared). A.057 (email from Deputy Clerk Ramos). Subsequent to the August 2020 hearing, after changed circumstances presented the opportunity for the defendant to propose to the Court substantially different conditions of release than were available at the time of the original detention hearing, defendant Musbach moved for release from detention pursuant to the motion the determination of which is now sought to be reviewed.

1

denying the defendant's motion for reasons stated on the record. A.002 (01-25-2021 Order Denying Motion). A transcript of the hearing and the Court's oral statement of reasons is attached hereto. A.003 (transcript). The Magistrate Judge noted that the Court was struggling with the decision (A.028, Tr. at 26:17-18), that the decision was a close call, and also stated that the Court would not be insulted by the defendant seeking review of the Court's Order. A.038 (Tr. at 36:2-16).

Title 18 United States Code § 3145 provides:

> (b) REVIEW OF A DETENTION ORDER.-If a person is ordered detained by a magistrate judge, or by a person other than a judge of a court having original jurisdiction over the offense and other than a Federal appellate court, the person may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order. The motion shall be determined promptly.

18 U.S.C. § 3145(b). The District Court's review is a *de novo* one. *U.S. v. Delker*, 757 F.2d 1390 (3d Cir. 1985)(District Court reviews a Magistrate Judge's detention determination on a *de novo* basis); *U.S. v. Cole*, 715 F. Supp. 677 (E.D. Pa. 1988)(DuBois, J.) ("18 U.S.C. § 3145(b) … requires this Court to make a de novo determination of the findings of fact underlying the detention Order.")

Mr. Musbach therefore seeks *de novo* review of his application for pretrial release on the proposed conditions set forth below, and contends that such combination of conditions adequately minimizes any perceived risk of flight or danger to the community,

and that the government cannot meet its burdens to establish the contrary.

In support of this request for *de novo* review, the defendant will rely on the below proposed conditions and arguments, as well as any other arguments and evidence adduced at any hearing on this *de novo* appeal to the District Court.  Of course, as his liberty without conviction is at stake, Mr. Musbach respectfully requests that the Court promptly determine this motion, as required by 18 U.S.C. § 3145(b).

## I.  THIS IS NOT A STATUTORY PRESUMPTION OF DETENTION CASE AND THEREFORE RELEASE IS THE PRESUMED OUTCOME

The government always has the burden of persuasion under the Bail Reform Act, 18 U.S.C. § 3142 (hereinafter "BRA").[2] Regarding a risk of flight analysis, the government's burden is by a preponderance of the evidence, and regarding danger to the community, the government's burden is by clear and convincing evidence.  *U.S. v. Himler*, 797 F.2d 156, 161 (3d Cir. 1986).  *See also* 18 U.S.C. § 3142(f)(clear and convincing standard applied to any finding regarding the safety of any other person or the community).  **Furthermore, the BRA provides a "presumption for bail except in certain circumstances", which circumstances do not exist**

---

[2] *U.S. v. Stone*, 608 F.3d 939, 946 (6th Cir. 2010) ("Regardless of whether the presumption applies, the government's ultimate burden is to prove that no conditions of release can assure that the defendant will appear and to assure the safety of the community.")

3

**in the instant case.**[3] *U.S. v. Strong*, 775 F.2d 504, 505 (3d Cir. 1985). *See also U.S. v. Byrd*, 969 F.2d 106, 109 (5th Cir. 1992) ("There can be no doubt that this Act clearly favors nondetention.")

Release is warranted here because there are conditions of bail that reasonably will assure both Mr. Musbach's appearance in court and the safety of the community. As the Supreme Court held in *U.S. v. Salerno*, 481 U.S. 739 (1987), "[i]n our society liberty is the norm, and detention prior to trial . . . is the carefully limited exception." *Salerno*, 481 U.S. at 755. The presumption of release is encapsulated in the BRA. "There can be no doubt that this Act clearly favors non[-]detention." *Byrd*, 969 F.2d at 110.

The statute states that the Court "shall order" pretrial release except in certain narrow circumstances. 18 U.S.C. § 3142(b). Even if the Court determines under § 3142(c) that an unsecured bond itself is not sufficient comfort for release of a defendant, the

> Judicial officer **shall order the pretrial release** of the person-
> (A) subject to the condition that the person not commit a Federal, State, or local crime during the period of release and [subject to DNA sample in specified applicable cases], and
> (B) **subject to the least restrictive further condition, or combination of conditions,** that such judicial officer determines will reasonably assure the appearance of the person as required and the safety of

---

[3] The circumstances creating a rebuttable presumption are not present in the instant case. *See* 18 U.S.C. § 3142(e)(2) and (e)(3)(setting forth when rebuttable presumption arises).

any other person and the community" 18 U.S.C. § 3142
the Court "shall order" release subject to "the least
restrictive further conditions" that will "*reasonably
assure*" the defendant's appearance in court and the
safety of the community.

18 U.S.C. § 3142(c)(1) (bold added). Under this statutory scheme,

"it is only a 'limited group of offenders' who should be detained

pending trial." *U.S. v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987)

(quoting S. Rep. No. 98-225, at 7 (1984), *as reprinted in* 1984

U.S.C.C.A.N. 3182, 3189).

Consistent with the fact that under the "eighth amendment …

there is a substantive liberty interest in freedom from

confinement", *U.S. v. Perry*, 788 F.2d 100, 112 (3d Cir. 1986),

**the burden of persuasion always rests with the government** (both

in presumption and non-presumption cases).  *Perry*, 788 F.2d at

115("[W]e hold that … the burden of persuasion ultimately rests

upon the United States").  *See also U.S. v. Jessup*, 757 F.2d 378,

381-384 (1st Cir. 1985). Indeed, the Third Circuit in *Perry*

recognized "the grave invasion of the most fundamental of all

personal liberties that occurs when preventive detention is

ordered and the high risk of an erroneous judgment as to the

highly speculative determination of future dangerousness".

*Perry*, 788 F.2d at 114.

## II.    THERE IS A COMBINATION OF CONDITIONS THAT WILL REASONABLY ASSURE THE APPEARANCE OF THE DEFENDANT AND THE SAFETY OF OTHER PERSONS AND THE COMMUNITY

John Musbach proposes a Release Order (as was proposed to the

Magistrate Judge) with the following combination of conditions

for release:

1. Execution of a **$100,000 Personal Recognizance Bond** (or higher if the Court deems necessary[4]), to be **cosigned** by each of Mr. Musbach's parents James Musbach and Elizabeth Musbach, and by Carl Williams.[5] In the alternative, if the Court believes such to be a necessary condition, although the defendant contends that such is unnecessary as a "least restrictive further condition" (18 U.S.C. § 3142(c)(B)), Mr. Musbach (through his Trustees[6]) actually would post $100,000 to satisfy a bond;

2. James and Elizabeth Musbach to act as **third-party custodians[7]** regarding their son (the defendant), including the requirement to report any violation of a release condition to the court. **Indeed, in a show of intent and commitment to such if required by the Court, James and Elizabeth Musbach have secured an apartment in the same apartment building[8] (indeed an apartment adjacent[9] to that in which Mr. Musbach and Mr. Williams would continue to live).**

   **They have placed a deposit on the apartment[10], and will promptly sign a one-year lease (subject to further renewal) if the Court grants this motion and requires as a condition that they come to NJ.** It is submitted that

---

[4] A.010 (Tr. at 8:4-8).

[5] Each of James Musbach, Elizabeth Musbach and Carl Williams attended the hearing (conducted by ZOOM) on January 25, 2021, A.009 (Tr. at 7:22 to 8:3). Each of them will be present at any hearing to be conducted by the District Court, and is available to testify and/or to answer any questions the Court may have. In addition, the United States Pretrial Services Agency vetted each of those sureties, also proposed as third-party custodians, and found them each acceptable. A.009 (Tr. at 7:16-21).

[6] John Musbach's parents have been made Trustees of all of his financial assets pursuant to a Trust and accounts to which John Musbach no longer has access, as further discussed *infra*.

[7] A.010 (Tr. at 8:16-17).

[8] A.010 (Tr. at 8:23 to 9:3).

[9] This apartment was secured to be available for a period of time, based upon the anticipated motion scheduling before the Magistrate Judge. If that specific apartment is not still available when this motion is decided, there are other available apartments in the same building.

[10] A.050 (screenshot regarding deposit, which was Exhibit B presented to the Magistrate Judge).

this condition is not necessary as part of the "least restrictive" conditions for bail or to insure safety and minimize risk of flight.  However, if that is what it takes for release of Mr. Musbach, then James and Elizabeth Musbach prefer to do so through the conclusion of any trial or other disposition in this case;

3. **James and Elizabeth Musbach as Trustees to control access to and use of funds belonging to Mr. Musbach** (a trust already has been established and the funds transferred, as discussed more fully *infra*).  James and Elizabeth Musbach (and John Musbach of course) are willing to abide by and be subject to a bail order requiring that no funds be provided directly to Mr. Musbach or used to facilitate any travel unauthorized by the Court, and that otherwise such funds be used only for living expenses for Mr. Musbach (housing, food, clothing, personal care items, etc.), medical expenses, legal fees and related expenses.[11]

4. Carl Williams to act as **third party custodian**[12] regarding the defendant, including the requirement to report any violation of a release condition to the court;

5. Mr. Musbach would remain on **24-hour house arrest** with electronic monitoring, with the standard exceptions permitted by this Court, and with exception for gainful employment[13];

6. Mr. Musbach to **refrain from having any Internet access** and would not be permitted the use of any electronic communication device other than a flip cellular telephone that has no ability to access the Internet, and Carl Williams, living with Mr. Musbach and also acting as third party custodian, also would monitor that no access occur[14];

7. Mr. Musbach seek employment (which employment, consistent with #6 above, would not require any Internet access)[15];

---

[11] A.012 (Tr. 10:5 to 11:23).

[12] A.010 (Tr. at 8:16-17).

[13] A.014 (Tr. at 12).

[14] A.0114 (Tr. at 12:22-25).

[15] A.014 (Tr. at 12:3-21).

8. Mr. Musbach to **reside at his former residence** (the address of which is omitted from this public filing, but which address the Court and U.S. Pretrial Services already are aware) with his significant other Carl Williams.  They have a signed lease for two years[16];

9. Mr. Musbach surrender any passport (his is expired as outlined in the Pretrial Services Report) and not apply for any new passport[17];

10. Mr. Musbach **report to Pretrial Services** as directed;

11. Mr. Musbach undergo **medical, psychological, or psychiatric treatment,** if the Court or Pretrial Services deemed such to be needed[18];

12. Mr. Musbach would comply with this District's additional standard conditions of release[19], to refrain from:

    o possessing a firearm, destructive device, or other dangerous weapon;

    o excessive use of alcohol;

    o any use of a narcotic drug or other controlled substance without a prescription;

    o committing another federal, state or local crime;

    o any contact with any known witness or alleged victim except through counsel or any investigators or others working with defendant's counsel.

## III.  ANALYSIS OF THE FACTORS UNDER 18 U.S.C. § 3142(g) AND OTHER FACTORS FAVOR RELEASE

Analysis of the factors under 18 U.S.C. § 3142(g) and other factors favor release, as discussed *infra*.  Although the Court should give respectful consideration to the Magistrate Judge's

---

[16] A.010 (Tr. at 8:9-15).

[17] A.015 (Tr. at 13:18-19).

[18] A.015 (Tr. at 13:20-23).

[19] A.015 (Tr. at 13:24 to 14:1).

8

reasons, there is no deference by a reviewing Court to those findings: the reviewing Court must "make an 'independent determination' of a detention order because of the **crucial liberty interest at stake**…. ". *United States v. Suppa*, 799 F.2d 115, 120 (3d Cir. 1986)(bold added). *See also Delker*, 757 F.2d at 1399.

The required *de novo* independent review by the District Court warrants a finding that the salient factors under the BRA require pre-trial release of Mr. Musbach. Those factors are:

**(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence**

While the crime charged is serious, no actual violence is alleged to have occurred, and John Musbach[20]  (as alleged on page 10 of the Affidavit in support of the Criminal Complaint) did indicate that he wanted to cancel the allegedly procured action. It also is important to note that the conduct is alleged to have occurred in May 2016, over four (4) years before the defendant's arrest in this case.

During that time, as discussed more fully *infra*, Mr. Musbach was on lifetime supervision by a NJ Probation Officer and had not a single infraction or misstep.

---

[20] By referencing such and pointing out this aspect of the factual allegations, the defense is not acquiescing that to the extent that the alleged communications even are authentic or occurred, that it was the defendant who engaged in those communications.  The acceptance of that allegation is only for purposes of this aspect of the motion.

**(2) the weight of the evidence against the person**

Of the BRA factors, "the weight of the evidence is the least important, and the statute neither requires nor permits a pretrial determination of guilt." *U.S. v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991). *See also U.S. v. Motamedi*, 767 F.2d 1403, 1408 (9th Cir. 1985) ("the weight of the evidence is the least important of the various factors").

Furthermore, "[t]his factor goes to the weight of the evidence of dangerousness, **not the weight of the evidence of the defendant's guilt**." *U.S. v. Stone*, 608 F.3d 939, 948 (6th Cir. 2010). Here, there is no evidence of dangerousness other than the nature of the alleged charges. Mr. Musbach has no violence in his past.

The government contended at the hearing below (at least inferentially and in response to an argument by the defense[21]) that a motivation to harm the alleged putative victim exists because that person or his family likely will be called by the government to testify at the trial of this matter.[22] That argument by the government, if repeated before this Court, is misplaced. The putative victim of the instant charge has no admissible knowledge of the alleged attempted murder for hire by Mr. Musbach, and therefore his (or his family's value as a

---

[21] A.031 (Tr. at 29:5-22).

[22] A.033 (Tr. at 31:4-8).

witness(es)) at best is contextual.  Indeed, it would be disingenuous for the government to contend that it could not establish that context in a myriad of other ways, none of which involve the need for the putative defendant or his family to testify.  The point here is not to suggest how the government should try its case: it is of course free to do so in any manner it deems fit.  The point is that there is no motive to the defendant to eliminate a witness that is certainly wholly unnecessary to the government's case as a factual and legal matter.  Furthermore, of course, all eyes are on Mr. Musbach so it genuinely defies common sense to think that he would engage in any such conduct to seek to harm the alleged victim under the present circumstances.[23] Indeed, the case is built on the alleged communications with a fallacious hit man website, which communications the government obtained through a hacker.  The case does not depend on any identifiable witnesses as its linchpin: it is truly in reality a "paper case" and a "money trail" case. The nature of the evidence is discussed further *infra*.

For the same reasons, the Magistrate Judge's indication that the motive to avoid jail still exists as a reason to be concerned that the defendant could harm others[24] is not

---

[23] Again, this is an argument regarding this motion for review, based on motive, not any concession that Mr. Musbach ever did attempt to bring any harm to the alleged victim.

[24] A.031 (Tr. at 29:23-25).

persuasive and should not be adopted by this reviewing Court. Again, because the government's case does not depend for its vitality on the alleged victim, his family, or any other identifiable witness without which its case would not survive, that alleged motive does not exist.  Harming or eliminating any person would not accomplish elimination of the government's case, and therefore there is no motivation to do so now as a means of avoiding jail.

Furthermore, the government and the Magistrate Judge's assessment of motive are inconsistent with the fact that Mr. Musbach **confessed in full detail on March 31, 2016** to police during execution of a search warrant for the underling state crime for which he was being prosecuted when the instant alleged crime occurred.  In light of the detailed and full confession, murder of the alleged victim would not have eradicated the prosecution's ability to convict Mr. Musbach and would not have increased his chances of avoiding jail (which by the way was in any event not imposed in sentence in the State case).

The **allegations in this case are that Mr. Musbach committed the attempted murder for hire "May 8, 2016 through May 20, 2016".**  Criminal Complaint, Docket Document 1 at 1. Although the Magistrate Judge (in fairness) was unaware of such, since the prior hearing defense counsel obtained a copy

of the police report detailing the interview of Mr. Musbach at the time of the execution of a search warrant and his arrest on **March 31, 2016**.  Mr. Musbach voluntarily waived his constitutional rights and confessed in the March 31, 2016 interview after being *Mirandized*, and among other things stated as follows:

- "He stated the victim introduced himself to him on the IRC network and they began communicating there. He stated that the victim stated he was 17 or 18 when they initially began to chat[25], but then later told him he was 13.

- He stated when they initially began to communicate the conversations were computer related. He stated the conversation eventually lead to a sexual nature.

- He stated that the victim sent him approximately 4 naked pictures and at one point he referred to them as "dick pictures". He also stated that he sent the victim a naked picture of himself.

- He stated the victim also sent him a video of himself masturbating.

- He further stated that he generated a masturbation video and sent it to the victim.

- He initially stated that he thought the victim was 17 or 18 when they traded pictures and video with the victim. He was then shown some of the printed out chats that contradicted this statement. He then admitted that he knew the victim was 13

---

[25] Indeed, even the victim in that case – the alleged victim in the instant case – acknowledged that he may initially have told Mr. Musbach that he was older: "the victim was not certain if he had told the defendant that he was sixteen years old, or his actual age." A.045 (04-21-17 PTI Rejection Letter from Assistant Cape May County Prosecutor Tracey O'Brien at 2).  This fact also is discussed *infra* in more detail in the mental health section as it is relevant to analyze the prior arguments of the government to the Magistrate Judge, and the Magistrate Judge's analysis, that Mr. Musbach was deceptive to the Avenel interviewer that initially he thought the victim was older.

> before the trading by saying, 'Yeah, I guess
> that is the correct order'."

A.042 (04-04-16 Atlantic County Prosecutor's Investigation Report at 2).  Furthermore, Mr. Musbach voluntarily provided the passwords to the electronic devices seized by the investigators on that same date.[26]

Therefore, with a full confession and full cooperativeness regarding the devices seized, the motive the government ascribed in its argument to the instant charged crime -- to have a non-critical witness to the prior state prosecution murdered to defeat the case and avoid jail -- is belied by a full confession to the state charge, which confession would remain potently evidential regardless of the availability of any witness (including the victim).  That fact – even at this undeveloped early stage of the defense investigation – further diminishes the weight of the evidence against Mr. Musbach of the crime currently charged.  While motive is not an element of the crime of course, the government's reliance on motive as a basis for its detention position is not convincing.

Also, although not the focus of this factor as stated above, this case is not a clear-cut case in which there is a proverbial "smoking gun": indeed, there are significant potential weaknesses in the government's case.  While at this

---

[26] A.043 (04-04-16 Atlantic County Prosecutor's Investigation Report at 3).

stage of course the defense is hampered by many things, including the impact that the Covid-19 pandemic continues to have on defense investigation which of necessity – as is almost everything else in the country – moving more slowly that in non-pandemic times, several things are known even from the government's Criminal Complaint and Affidavit.

The alleged communications were obtained by some undisclosed confidential source who in January 2019[27] supposedly hacked into a "dark website" to obtain these alleged and indeed incomplete communications. **The government fails to reveal the name of this alleged website, or the identity of the alleged hacker**, and merely had its agent in footnote 1 on page 5 of the Affidavit in support of the complaint allege that the source is "believe[d]" to be credible by the agent.

That untested "belief" is devoid of any specific basis on which the Court or the defense could conclude that such is true.  In addition, it is clear that the alleged communications are only snippets of communications, and that this hacker either did not obtain or did not provide the full context of such, which limits the reliability, context, and efficacy of what allegedly was obtained.  The hacker certainly easily could have manipulated the information, and

---

[27] *See* Paragraph 12 of Affidavit in support of Criminal Complaint (docket document 1).

it appears that the hacker obtained the information illegally through computer intrusion, itself a federal crime. Furthermore, this hacking occurred in January 2019, over 2.5 years after the alleged communications.

The foregoing leads to a fair inference and challenge that the communications selectively were edited or manipulated by this source hacker, if even authentic.  When coupled with the presumption of innocence, of course, this factor mitigates in favor of pre-trial release.  18 U.S.C. § 3142(j)("PRESUMPTION OF INNOCENCE.-Nothing in this section shall be construed as modifying or limiting the presumption of innocence.").

Certainly the hacker source's motivations to obtain and to provide that information to the government – financial remuneration or criminal prosecution leniency for example – are relevant to a determination of the strength or weakness of the case against the defendant including for purposes of this motion. The government should not be permitted to hide behind source confidentiality or exposure of other investigations[28] to avoid scrutiny when it seeks pre-trial detention, as **detention causes "the grave invasion of the most fundamental of all personal liberties….".**  *Perry*, 788

---

[28] The government did so in footnote 2 (page 5) of the agent's Affidavit in support of the Criminal Complaint (docket document 1).

F.2d at 114 (bold added).  If the government continues to do so of course, the Court should infer strongly against the government in the determination of whether it has met its burden of persuasion in connection with this motion.

To the extent that the government seeks to rely on the alleged strength of its case in opposition to this motion, and the Court is inclined to weigh it in that context, an evidentiary hearing during which the defense is permitted to probe these issues certainly is appropriate and warranted. The government should not be permitted to proceed by proffer or merely rely upon the affidavit to the complaint.

**(3) the history and characteristics of the person, including-**

**(A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings;**

- **Mental Condition.**  Mr. Musbach has been determined to have neurocognitive impairment, and has had a history of mental health treatment dating back to age 10.  His neurocognitive impairment was diagnosed by State of NJ employed medical professionals who evaluated Mr. Musbach in connection with a psycho-sexual evaluation for the Court (an Avenel evaluation) in connection with his prior State criminal case.  **The testing and evaluation determined that Mr. Musbach did not have "any sexual**

interest in minors" (bold added).[29]

Mr. Musbach and society would benefit more from evaluation and counselling/treatment in the pretrial phase than incarceration.

At the hearing before the Magistrate Judge, the government contended that Mr. Musbach was deceptive based on the Avenel evaluation report because it states that he denied knowing the victim's age.[30]  What the report actually states is that Mr. Musbach said he was "uncertain about the victim's age" being 13 during their interaction and explained his confusion.  See **Exhibit A** to the defense motion the denial of which is here being reviewed, at 2-3.  Indeed, that confusion – not deception -- is consistent with the fact that as reported by the Assistant County Prosecutor handling the state case against Mr. Musbach, **the victim himself "was not certain if he had told the defendant that he was sixteen years old, or his actual age."**  A.045 (04-21-17 PTI Rejection Letter from Assistant Cape May County Prosecutor Tracey O'Brien at 2, highlight added).

Therefore, the Magistrate Judge's reliance on deception to the Avenel evaluator was misplaced.  Again, in fairness to the Magistrate Judge the PTI Rejection letter was not part of the hearing as the government's argument of that point was not anticipated (and indeed the government only submitted its reply brief shortly before the hearing on the same day).  This Court now has the letter and therefore respectful consideration of the Magistrate Judge's assessment of this issue does not warrant adoption of that reasoning now that more information is available.

- **Family and Community Ties and Length of Residence in the Community.**  Mr. Musbach has family ties to the

---

[29] This information is from an evaluation report by State of NJ employed medical professionals who evaluated Mr. Musbach in connection with an Avenel evaluation regarding his prior State criminal case.  The evaluation was Exhibit A to the motion determined by the Magistrate Judge, who granted the defense motion to maintain that document under seal.  I assume that the District Court can access that Exhibit A sealed document in the Court's file, or if the Court prefers the undersigned can provide a copy to the Court's Deputy Clerk as well.  The defendant does incorporate that Exhibit A as part of the Appendix for purposes of the instant motion for review (although not actually included in the Appendix).  A placeholder reference at A.001 has been included to reference this document.  **It respectfully is requested that Exhibit A continue to be maintained UNDER SEAL given that it is a medical record and Confidential, as it contains personal and medical information.**

[30] A.023 (Tr. at 21:20-21).

community.  His significant other Carl Williams and he
have lived and worked in New Jersey for the past five
(5) years approximately.  They are committed to a lease
agreement at their current residence.

Also, as outlined above, Mr. Musbach's parents are
willing to leave their home in California and reside in
NJ, in the same apartment building as Mr. Musbach.  See
A.050 (screenshot regarding deposit[31]).  That
extraordinary measure demonstrates the strength of the
family ties Mr. Musbach has, and the seriousness with
which his parents take the commitment to be third party
custodians and sureties.

- **Employment.**  Mr. Musbach has a history of sustained
  gainful employment and was considered a valuable
  employee, as reflected in the Pretrial Services Report.
  *See also* A.051 (letter from Scott DeGirolamo, former
  employer[32]).  Mr. Musbach – if permitted by the Court –
  would seek employment that does not require access to
  the Internet consistent with the proposed bail provision
  that he have no such access.

- **Financial Resources.**  The access to financial resources
  was an articulated concern by the Magistrate Judge at
  Mr. Musbach's first detention hearing in August 2020.
  Since then Mr. Musbach employed the services of attorney
  Joseph Viola, Esq., to create and transfer all
  substantial assets owned by Mr. Musbach into a Trust to
  which John Musbach does not have access (his parents are
  the Trustees), and in one instance into the sole
  possession and control of his mother Elizabeth Musbach.
  A.052 (01-13-2021 letter from Viola Esq. redacted as to
  account identifying information[33]).  James and Elizabeth
  Musbach solely now control access to those funds and are
  of course willing to abide by the proposed Order that no
  funds be provided directly to Mr. Musbach or used to
  facilitate any unauthorized travel, and that otherwise
  such funds be used only for living expenses for Mr.
  Musbach (housing, food, clothing, personal care items,
  etc.), medical expenses, and legal fees and related
  expenses.

---

[31] This document was Exhibit B in the prior proceeding before the Magistrate
Judge.

[32] This letter was Exhibit C in the prior proceeding before the Magistrate
Judge.

[33] This letter was Exhibit D in the prior proceeding before the Magistrate
Judge.

This freeze-out of resources from Mr. Musbach certainly adequately minimizes any risk of flight, in combination with the other very restrictive conditions of release proposed in this motion.

- **Past Conduct/Criminal History/Record Concerning Appearance at Court Proceedings.** Mr. Musbach's prior conviction is of a non-violent nature, and the alleged instant conduct as discussed *supra* was approximately 4.5 years ago. Mr. Musbach never has had a failure to appear in Court. He was polite and cooperative during his arrest in the instant matter, with no resistance either verbal or physical.

   In addition, the alleged instant conduct was prior to Mr. Musbach's sentencing in his prior State criminal case.  Mr. Musbach never once violated any condition of the sentence previously imposed upon him, or his lifetime supervision.  By way of uncontested proffer[34], the undersigned advised the Magistrate Judge that he had spoken with New Jersey State Parole Officer Linval Jones, who supervised Mr. Musbach for a period of time. Probation Officer Jones advised that:

   ➢ Mr. Musbach always was polite and cooperative;

   ➢ Mr. Musbach always complied with any requests by Officer Jones;

   ➢ Mr. Musbach always reported if and as directed, and made himself available for home visits as requested;

   ➢ Mr. Musbach maintained employment and presented proof when requested;

   ➢ Ofr. Jones never perceived any danger or violent nature from Mr. Musbach;

   ➢ Ofr. Jones is not aware of any infractions of supervision at any time by Mr. Musbach;

   ➢ Ofr. Jones advised he would confirm such to U.S. Pretrial Services if inquired.

- **History relating to drug or alcohol abuse.**  None.

---

[34] A.019 (Tr. at 17:10 to 18:10).

**(B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law**

Mr. Musbach's prior State criminal case was pending, but again that the conduct alleged in the instant case was indeed 4.5 years ago.  As discussed in detail *supra*, since the time of his sentencing he has proven himself to be a model supervisee.

**(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release**

Here, there is no demonstrable risk of flight or facts to support any such conclusion of ongoing dangerousness, so any perceived danger is inapposite.  Importantly as articulated by the Fifth Circuit, "we find ourselves in agreement with the First and Third Circuits: **a defendant's threat to the safety of other persons or to the community, standing alone, will not justify pre-trial detention.**" *U.S. v. Byrd*, 969 F.2d 106 (5th Cir. 1992)(bold added).

Furthermore, there is no alleged danger posed that will not be adequately minimized by the proposed conditions.  The alleged victim of the crime is not even a necessary witness to the government's case, and there is not even any such potential motivation[35] in that respect, as addressed *supra*. The demonstrable

---

[35] This reference is made not to suggest that even if there were that Mr. Musbach would act on such, but simply to iterate the lack of any such potential motivation.

compliance with all terms of his State Court post-sentencing supervision (as discussed *supra*) over the past approximately 4.5 years supports the only conclusion: that release and supervision of Mr. Musbach poses no danger to other persons or the community.

### (5) Other Salient Factors: The Covid-19 Pandemic – Delay and Risky Exposure

As indicated, "[**i]n our society liberty is the norm, and detention prior to trial . . . is the carefully limited exception.**" *Salerno*, 481 U.S. at 755 (bold added).  Here, especially during the Covid-19 pandemic where trials have essentially shut down and any start-up of trials in this District appears to be at a long time away, detention of Mr. Musbach pending his trial will be longer than normal.  That is simply a pragmatic recognition of the obvious, and because his case is a lot newer than many others that already were pending, it is realistic to recognize that continued delay.

Indeed, it is unlikely that this case would even reach trial in 2021, and certainly not until the last part of 2021 at the earliest. Mr. Musbach has not yet been indicted.

It is indeed injurious to detain a presumed innocent person at all, let alone for as long as this detention will last, and the Court should strongly consider that fact in favor of release on these very restrictive but adequate conditions.  *See U.S. v. Gonzales Claudio*, 806 F.2d 334, 341 (2d Cir. 1986) ("Detention that has lasted for fourteen months and, without speculation, is

22

scheduled to last considerably longer, points strongly to a
denial of due process. *See U.S. v. Zannino,* 798 F.2d 544,
548 (1st Cir. 1986) (court assumes "that in many, perhaps most,
cases sixteen months would be found to exceed the due process
limitation on pretrial confinement").

Certainly, under house arrest and the conditions proposed,
Mr. Musbach also will be better insulated from exposure to Covid-
19 than in jail.  It is indisputable that like nursing homes and
cruise ships, and to an extent even more so because of
limitations inherently present in a jail environment, jails are
extremely dangerous in a pandemic, given the impossibility of
social distancing in a confined space.  Jeffrey Keller, *COVID-19
in Jails? It Might Get Ugly*, Medpage, (March 12, 2020)
(https://www.medpagetoday.com/blogs/doing-time/85366). As the
former chief medical officer of Rikers Island jail explained,
unlike free people, detainees cannot engage in "'social
distancing' and 'self-quarantine' and 'flattening the curve' of
the epidemic—all of these things are impossible in jails and
prisons, or are made worse by the way jails and prisons are
operated."[36]

---

[36] Jennifer Gonnerman, *How Prisons and Jails can Respond to the Coronavirus*, The
New Yorker, (March 14, 2020), https://www.newyorker.com/news/q-and-a/how-
prisons-and-jails-can-respond-to-the-coronavirus ("it's going to be very, very
difficult to deliver a standard of care either in the detection or the
treatment of people who are behind bars. I just have really grave concerns").
*See also* Dr. Lipi Roy, *Infections And Incarceration: Why Jails And Prisons Need
To Prepare For COVID-19 Now,* Forbes, (March 11, 2020),
https://www.forbes.com/sites/lipiroy/2020/03/11/infections-and-incarceration-

Anecdotally, real people incarcerated are having modest sentences turned into death sentences. As an anecdotal example, the undersigned counsel was notified recently that while a former client's motion for compassionate release from federal incarceration due to potential Covid risks was pending in the U.S. District Court for the Eastern District of PA, that client indeed then contracted Covid and sadly died from complications related to such. He was about 21 months into a 63-month sentence, which turned into a death sentence. Clearly there are real risks in the heightened environment of jail.

The CDC has noted that correctional facilities "present[] unique challenges for control of COVID-19 transmission among incarcerated/detained persons", and that detained persons face a heightened risk of contracting the virus due to the living conditions and limited options for medical isolation. https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

Pre-trial release of Mr. Musbach -- **a presumed innocent man** -- on the conditions requested herein, also would place him in a much less risky environment regarding exposure to Covid-19, where he can properly social distance only with persons known to him,

---

why-jails-and-prisons-need-toprepare-for-covid-19-stat/#1fa6b08e49f3   ("Hand sanitizers, for instance, are often considered contraband . . . Other harsh realities of jail life that prevent proper application of CDC recommendations include limited access to toilet paper and paper towels; and handcuffs prohibit the use of hands to cover one's mouth.").

and would not have the risk of the introduction of Covid-19 into the facility by staff members as occurs now daily, and by the other inherently dangerous factors present in jail.

## CONCLUSION

Clearly there is no factual basis on which to conclude that John Musbach presents any risk of non-appearance at any future proceedings.  Any perceived risk of danger based on allegations of conduct occurring almost five (5) years ago adequately will be minimized by the proposed conditions.

**WHEREFORE,** it respectfully is requested that the defendant John Michael Musbach be released on the conditions of bail specified in Section II above, and any other condition which the Court may find is the "least restrictive further condition"[37] necessary to insure appearance of Mr. Musbach as required and the safety of any other person or the community.

Respectfully submitted,

/s/ *Rocco C. Cipparone, Jr.*

_____
Rocco C. Cipparone, Jr., Esq.
Attorney for Defendant John Musbach

---

[37] 18 U.S.C. § 3142(c)(B) provides that release shall be "subject to the least restrictive further condition, or combination of conditions, that such judicial officer determines will reasonably assure the appearance of the person as required and the safety of any other person and the community…."

**APPENDIX**

**MEDICAL REPORT REQUESTED TO REMAIN**

**FILED UNDER SEAL AND NOT INCLUDED IN**

**THE PUBLIC FILING (EXHIBIT A TO**

**DOCUMENT ENTRY 20)**

*A.* **001**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA

v.

JOHN MICHAEL MUSBACH

Case No. 20-mj-5666-KMW

### ORDER DENYING MOTION FOR RELEASE FROM CUSTODY [DOC. 20]

THIS MATTER having come before the Court on the Motion of Defendant, John Michael Musbach, for Release from Custody [Doc. No. 20]; and the Court noting the application by the Government for continued detention; and the Court having heard the arguments of counsel during the hearing held on January 25, 2021; it is hereby ORDERED this **25th** day of **January, 2021**, that the Motion for Release from Custody is **DENIED** for the reasons set forth on the record.

KAREN M. WILLIAMS
UNITED STATES MAGISTRATE JUDGE

**A. 002**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA,    )   20-MJ-5666-KMW-1
 )
 )
    v.    )
 )
 )
JOHN MICHAEL MUSBACH,    )
 )   Camden, NJ
 )   January 25, 2021
    Defendant.    )   2:04 p.m.

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE KAREN M. WILLIAMS
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:  (Via Zoom)

For the Government:    DIANA CARRIG, ESQUIRE
    ASSISTANT UNITED STATES ATTORNEY
    UNITED STATES ATTORNEY'S OFFICE
    District of New Jersey
    401 Market Street
    Camden, New Jersey  08102-1568

For the Defendant:    ROCCO C. CIPPARONE, JR., ESQUIRE
    ROCCO C. CIPPARONE, JR. LAW OFFICES
    205 North Black Horse Pike
    Haddon Heights, New Jersey  08035

Audio Operator:    NICOLE RAMOS

Transcribed by:    DIANA DOMAN TRANSCRIBING, LLC
    P.O. Box 129
    Gibbsboro, New Jersey  08026-0129
    Office:  (856) 435-7172
    Fax:     (856) 435-7124
    Email:    dianadoman@comcast.net

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

2

1                        I N D E X

2    INSTRUCTIONS TO THE DEFENDANT:                      PAGE

3         By Judge Williams

4    Re:  Legal rights of the defendant                    4

5    Re:  Appointment of counsel                           4

6

7    ARGUMENT:                                           PAGE

8    Re:  Motion for release from custody

9         By Mr. Cipparone                         6, 23, 28

10        By Ms. Carrig                               18, 31

11

12   DECISION OF THE COURT:                              PAGE

13        By Judge Williams

14   Re:  Motion for release from custody                 35

15   Re:  Motion to seal                                  37

16

17

18

19

20

21

22

23

24

25

A. 004

Colloquy                                    3

1           (The following was heard via Zoom at 2:04 p.m.)

2           THE COURT:  All right.  We're here this afternoon in

3    the matter United States of America verus John Michael

4    Musbach, Docket Number 20-MJ-5666.

5           We are here this afternoon on defendant's motion for

6    release, Document Number 21, in this case.

7           In order to proceed in this format, which is virtual

8    for a detention hearing,we must have the defendant's consent.

9    I recognize that Mr. Cipparone is defense counsel for Mr.

10   Musbach and so I will ask him whether or not he has obtained

11   his client's consent to proceed this afternoon virtually?

12          MR. CIPPARONE:  Good afternoon, Your Honor.  Yes, I

13   have received Mr. Musbach's consent to proceed virtually.

14          THE COURT:  All right.  I am going to direct a

15   couple of questions directly to the defendant so that I can be

16   sure that given this platform the defendant is able to

17   understand the proceedings this afternoon and hear me more

18   importantly.  So, Mr. Musbach, can you hear me?

19          THE DEFENDANT:  Yes, I can, Your Honor.

20          THE COURT:  Is there any reason why you would be

21   unable to understand the proceedings this afternoon?

22          THE DEFENDANT:  No, Your Honor.

23          THE COURT:  All right.  May I have appearance for

24   the Government, please.

25          MS. CARRIG:  Good afternoon, Your Honor.  Diana

**A. 005**

Colloquy                                    4

1    Carrig, Assistant United States Attorney, for the Government.

2              And I have with me here, Your Honor, on this Zoom

3    Special Agent Lance Herbert from Homeland Security.

4              THE COURT:  All right.  Thank you.  And may I have

5    an appearance for the defendant as well?

6              MR. CIPPARONE:  Good afternoon, Your Honor.  Rocco

7    Cipparone on behalf of John Musbach.

8              THE COURT:  All right.  Even though we're here for a

9    detention hearing I always take this opportunity to remind the

10   defendant of his rights.

11             Mr. Musbach, you have the right to remain silent.

12   That means you're not required to speak with anyone or to make

13   any statements.  But if you do, you start speaking and change

14   your mind, you may stop speaking at any time.

15             You should know that anything you say can and

16   probably will be used against you.

17             You have the right to remain silent.  Do you

18   understand that right?

19             THE DEFENDANT:  Yes, Your Honor.

20             THE COURT:  You also have to be -- have the right to

21   be represented by an attorney.  You're entitled to consult

22   with and be represented by an attorney during any questioning

23   by law enforcement and at any and all proceedings, including

24   this one.

25             THE DEFENDANT:  I understand.

A. 006

1          THE COURT:  Do you understand that right?

2          THE DEFENDANT:  Yes, Your Honor.

3          THE COURT:  Mr. Cipparone has been -- has entered

4   his appearance on your behalf and will continue to represent

5   you --

6          THE DEFENDANT:  Yes.

7          THE COURT:  -- as retained counsel.

8          THE DEFENDANT:  Yes.

9          THE COURT:  All right.  This matter comes before the

10  Court on the request of the defendant for -- has made a motion

11  to release.

12         In considering this application I'm guided by

13  several principles.

14         First, at all times defendant is entitled to

15  presumption of innocence.  Nothing that takes place in the

16  hearing or that I set forth in my findings is intended or

17  should be construed to affect that presumption.

18         Rather, the purpose of this hearing is to determine

19  whether, notwithstanding the presumption of innocence, the

20  defendant should be detained pending trial.

21         Second, under the Bail Reform Act pretrial detention

22  is an exceptional step.  Under the Act a defendant must be

23  released prior to trial unless a judicial officer finds that

24  no condition or combination of conditions exist which will

25  reasonably assure the appearance of the defendant or

Cipparone - Argument                                6

1    reasonably assure the safety of any other person in the

2    community.  The Act requires the least restrictive conditions

3    be imposed that are necessary to provide those reasonable

4    assurances.

5         If I cannot find any conditions that will reasonably

6    -- reasonably assure the defendant will appear as required or

7    the safety of the persons in the community then I'm required

8    by the Act to order the defendant held in custody.

9         Mr. Cipparone, this is your motion.

10        MR. CIPPARONE:  Thank you, Your Honor.

11        I have hopefully been fairly comprehensive in the

12   written submission to the Court and I've tried in that

13   submission to go through substantially all of the factors that

14   the Court has to consider in addressing bail and the factual

15   support for the positions taken, so I'm going to rely in large

16   measure on the written submission to the Court which I know

17   Your Honor has read as always.

18        But I -- so I'll be a little more summary in my

19   comments here because I know the Court's read that detailed

20   submission, but I, of course, would answer any questions the

21   Court has as well.

22        By way of summary, since the last hearing many

23   factors have changed and circumstances have been presented to

24   the Court now that I think do present a viable combination of

25   conditions which would reasonably minimize both the risk of

Cipparone - Argument                                              7

1    flight and the danger to the community and that the Court can

2    and should find that those combination -- combination of

3    conditions adequately address the concerns under the Bail

4    Reform Act recognizing as well, as the Court just did, that

5    detention is not the norm.

6           That, obviously, the infringement upon liberty by

7    detention is substantial and that the goal of the Bail Reform

8    Act, and the Court's focus in these matters, should be with an

9    eye toward release if there is any appropriate combination.

10          I'll address those factors, Your Honor, and how the

11   factors have changed since the last hearing.

12          The first condition that I've proposed to the Court

13   is $100,000 personal recognizance bond to be co-signed by

14   three persons, all of whom I know have been vetted by Pretrial

15   Services.

16          I did receive an email from Ms. Smith last week --

17   at the end of last week, or maybe over the weekend, I forget

18   frankly, indicating that she spoke with those sureties, that

19   she -- that they have no prior criminal histories and they are

20   -- essentially would be acceptable sureties to the extent that

21   the Court were to grant it.

22          They are Carl Williams, who is Mr. Musbach's

23   significant other, who, as Your Honor can see, is here present

24   on the Zoom if any questions from the Court were to arise.

25          And also James and Elizabeth Musbach, Mr. Musbach's

1    parents, who as well, as Your Honor can see, are present on

2    the Zoom and certainly are available to answer any questions

3    the Court would have as well.

4            I'm not wed to the amount of the bond, meaning if

5    the Court thought a higher amount was necessary we're

6    certainly, you know, not saying the Court's limited to

7    $100,000, but the proposal I think is substantial and

8    reasonable in the circumstances.

9            In addition to co-signing the bond both Mr.

10   Williams, who would be residing as he had prior to Mr.

11   Musbach's arrest, with Mr. Musbach in their apartment in

12   Haddonfield which, as Your Honor knows from this submission

13   and in the past submission, they've resided at for several

14   years.  They have signed a lease that extends for the next two

15   years.

16           Mr. Williams would act as a third party custodian as

17   would James and Elizabeth Musbach as well.

18           As Your Honor knows from my written submission,

19   they've taken what I consider the extraordinary measure to

20   show the Court that indeed they have confidence that John

21   would, in fact, comply with all of the Court's bail terms by

22   not only agreeing to act as third party custodians, but, in

23   fact, to relocate through the pendency of Mr. Musbach's trial

24   or the disposition of this case, to New Jersey, leaving their

25   home in California, lease an apartment that is literally

Cipparone - Argument                                    9

1    across the hall from that which would be occupied by Carl

2    Williams and John Musbach and to serve as third party

3    custodians.

4           I think that, respectfully, shows the Court leaps

5    and bounds that they are willing, for lack of a better term,

6    one, to put their money where their mouth is in terms of

7    signing the bond, but also to relocate their entire lives in

8    support of their son and in the belief that he'll comply with

9    the bail conditions.

10          And I respectfully think that that provides the

11   Court -- should provide the Court substantial confidence that

12   that's a condition that if the Court saw fit to impose would

13   warrant release.

14          I want to say also that I don't know that that's

15   necessary because I don't want to unnecessarily impose on Mr.

16   and Mrs. Musbach, but they're fully committed to and don't

17   want the Court to consider anything but their willingness to

18   do it.  If the Court thought it was an appropriate resolution

19   they're fully willing to do that and capable of doing it.

20          And, as I said, they placed -- and Your Honor can

21   see I think it's Exhibit B to my motion.  I might be misspoken

22   as to the exhibit letter, but there was, in fact, a deposit

23   placed on the apartment.  They have a lease available for

24   signature and their move-in date could be as early as February

25   8th and they've simply held off on signing the lease, as

A. 011

1    opposed to providing the deposit, pending the Court's

2    disposition of this motion, but they're fully prepared to sign

3    that lease and proceed forward if that condition is imposed by

4    the Court.

5            The third condition I proposed, which is already in

6    place, relates to what the Government contended, and the Court

7    understandably previously had thought, you know, were -- were

8    financial means that could assist Mr. Musbach in fleeing.

9            And let me first say, again, I don't think there is

10   any likelihood of Mr. Musbach fleeing these charges or

11   cooperating with the Court's bail, but in order to give the

12   Court more confidence in that regard Mr. Musbach consented to,

13   and it's now been in place, that all his assets have been

14   essentially removed from his name.

15           James and Elizabeth Musbach, his parents, act as

16   trustees of substantially all of his assets, with one

17   exception that is not in the trust yet and I'll explain why,

18   but it has been placed into an account that is solely

19   controlled by Elizabeth Musbach, not the trust yet, but she

20   maintains sole control of that.

21           And, Your Honor, this was a substantial undertaking.

22   Counsel had to be retained who is -- certainly has more

23   expertise in setting up trusts than I do, and that's not hard

24   since I have none, but Mr. Viola submitted a letter to the

25   Court, which I believe is Exhibit C to the defense submission,

Cipparone - Argument                                11

1   to outline exactly how those funds went.

2           What was happening frankly is each time we were

3   trying to move -- they were trying to move the funds into an

4   asset to put in the trust these various entities would, as I

5   know a lot of these electronic currency carriers do, were

6   googling and doing background research and Mr. Musbach's case

7   would come up, so they would close the account unilaterally

8   with no explanation.

9           So it took a while to get the funds into locations

10  that could be solid and transferred into a trust, but there

11  were Herculean efforts frankly to move that money around to be

12  able to get it into this format.

13          So that's a long way of saying, Judge, that Mr.

14  Musbach will have -- one, now has no access to those funds or

15  control over those funds.

16          And, two, if the Court orders it further, of course

17  James and Elizabeth are willing to abide by the Court's order

18  to only release funds for living expenses for Mr. Musbach.

19          Not to be self-serving, but for legal expenses for

20  Mr. Musbach, and in other ways that are expressly approved by

21  the Court.

22          So those funds and his ability to access those funds

23  are locked down now.

24          I've already -- I'm just running through my list

25  here, Your Honor.

1    I've also proposed 24 hour house arrest for Mr.
2    Musbach with electronic monitoring.
3        Of course, I think it productive for any defendant
4    to be able to seek and maintain gainful employment.
5        I was mindful of the Court's concerns about Internet
6    access in the past and so what we've proposed is that he get a
7    job, if he can secure employment, that does not involve in any
8    way, shape or form, access to the Internet which means he
9    would have to do something other than what he was doing when
10   he was arrested.
11       But, you know, there's plenty of productive gainful
12   employment that can be had short of having access to the
13   Internet and Mr. Musbach's, of course, willing to abide by
14   those limitations.
15       So I would ask the Court to allow for gainful
16   employment as approved by Pretrial Services if the Court
17   releases him.
18       But, of course, if the Court thought that that's not
19   appropriate then just straight 24 hour house arrest with
20   electronic monitoring's also acceptable.  Anything, of course,
21   is better than detention, Your Honor.
22       Mr. Musbach, again, also would refrain from having
23   any Internet access.  Mr. Williams would certify as a third
24   party custodian that he would not allow any such access to his
25   devices or any devices.

Cipparone - Argument                    13

1          Mr. and Mrs. Musbach would literally be living
2   directly across the hall and would be there essentially 24/7
3   for the most part as well.
4          I would ask the Court, by the way as an aside, in
5   considering that -- that factor and the relocation of Mr. and
6   Mrs. Musbach that there are times there may be where one of
7   them would have to travel back to California, obviously, to
8   check their residence, maybe interact with their other adult
9   son who lives at that residence who's 28 and there's no need
10  for, you know, direct oversight in that regard.
11         But that if one of them remains in New Jersey while
12  the other one were to travel to back to California for a week
13  or so to handle their personal business that that be adequate
14  during the pendency of any bail release, but, again, I just
15  wanted to raise that to the Court.
16         Mr. Musbach, of course, would continue to reside at
17  the residence that's indicated.
18         His passport's already been expired, as Your Honor
19  knows.  He would not apply for any new travel documents.
20         He would undergo medical, psychological and
21  psychiatric treatment as -- and counseling as appropriate and
22  as recommended if Pretrial Services were to feel the need for
23  such and comply with that.
24         He would comply with all the standard conditions
25  that the Court imposes and, again, they're set out in my

Cipparone - Argument                    14

1    brief.  I won't go through those in more detail, but those are

2    the salient conditions, Your Honor, that I'm proposing.

3              But I also, of course, the defense is also aware

4    that the Court could impose -- if Your Honor has additional

5    conditions that you thought appropriate, obviously, we could

6    address those as well.

7              I've run through in Section three of my brief the

8    various factors under the Bail Reform Act, so I won't belabor

9    those.  In fact, what I thought I would do, Your Honor, is

10   just rely on that since it was fairly comprehensive.

11             But I did receive Ms. Carrig's reply brief a short

12   time ago and there are some comments I would make to that that

13   tie into those factors.  And perhaps now, if it's okay with

14   the Court, I'll just -- I'll do that now and then I can always

15   respond after Ms. Carrig speaks as well, but I can at least

16   highlight the areas of her brief if that's okay with Your

17   Honor?

18             THE COURT:  That would be beneficial.

19             MR. CIPPARONE:  Thank you, Your Honor.

20             So the first thing I'll note is as I read the

21   Government's brief, and I'm not going to speak to Ms. Carrig

22   -- for Ms. Carrig, but I think there's at least implicitly in

23   here some -- on page two a concession that the risk of flight

24   factors can be adequately minimized by what's been proposed by

25   the defense.

1          And I particularly refer to the statement that says

2     "while the reduced access to money may reduce Mr. Musbach's

3     risk of flight",  I think it's certainly unequivocally true

4     that that would reduce anybody's risk of flight, but so do all

5     those other factors.

6          So I'm going to focus a little more on the danger to

7     the community aspect of the Government's argument because

8     that's were it seems to place the primary focus in its brief.

9     And I just have a few -- few points in response to the

10    Government's brief.

11         Look, we're never going to be able to debate the

12    merits fully at this stage, nor is it appropriate to do that.

13         I do want to go back to the statement in the Byrd

14    case that the Government does reference and tries to

15    distinguish in its brief that a defendant's threat to the

16    safety of others, or at least perceived threat, or the

17    community standing alone, will not justify pretrial detention.

18    And I've cited the Byrd case for that proposition in my brief.

19         And the Government attempts to distinguish it saying

20    that that was a case in which the defendant was not entitled

21    to a hearing.  But really the hearing issue doesn't change the

22    substance and the gravamen of that concept which is whether

23    there's a hearing or not is a procedural issue.  It's the

24    Government's right to have a hearing and I don't -- I do not

25    contest that it's their right to have a hearing here and

1    that's what we're doing right now.

2          But the substantive statement that the threat to the

3    safety of the community or other persons in itself standing

4    alone is not a basis for detention holds true whether there is

5    or is not a hearing.  That's a substantive issue that I think

6    still holds true and I ask the Court to keep in mind that

7    adage from the Third -- from the Fifth Circuit in which it

8    addressed that aspect of the Bail Reform Act.

9          The Government in its submission, you know, does --

10   and, Your Honor, I know there's a motion to seal the

11   psychological report.  I can address that when and if the

12   Court wants, but the Government makes reference to that as did

13   I in my motion.

14         Bear with me, Your Honor, while I put my reading

15   glasses on to look at my other screen.

16         You know, the Government makes much of the fact that

17   -- and I understand why -- that the alleged victim, or the

18   victim in the prior crime of which Mr. Musbach was convicted,

19   was 13-years-old and that's pulled out of that report.

20         But I want to emphasize from that report, which was

21   the express purpose of that evaluation, it was an Avenel

22   report, as Your Honor knows, was to determine if Mr. Musbach

23   was a sexual predator or sexually attracted to minors and the

24   expert conclusion was, in fact, that he is not.  And I think

25   that's important to bear out because the Government does

**A. 018**

Cipparone - Argument                    17

1    emphasize the age as it related to Mr. Musbach's prior crime.

2    And while I don't denigrate the significance of that crime or

3    detract from it, I think that -- from that perspective it's

4    important for the Court to consider as well.

5            So I do think, Your Honor, that the conditions

6    imposed are substantial.  They are extremely restrictive.  And

7    not withstanding the nature and circumstances of the alleged

8    crime here, and I don't mean this in a flippant way to the

9    Government, that's all the Government has going for it here.

10           I do understand that Mr. Musbach was on bail at the

11   time that these alleged incidents occurred, but as a

12   counterbalance to that, Your Honor, and I think it's

13   significant, respectfully, almost five years had elapsed since

14   that conduct.

15           Mr. Musbach was on supervision and as Your Honor --

16   as I've represented to Your Honor in my submission based on a

17   conversation I had with Linval Jones, who was supervising Mr.

18   Musbach on release, and he did indicate he's available to

19   speak to Pretrial Services or the Court, Mr. Jones indicated

20   that Mr. Musbach essentially -- and I'm summarizing the

21   details in my submission, Your Honor, -- Mr. Musbach was a

22   model supervisee post-sentencing over the last, you know, four

23   and a half years before he was rearrested in this case.

24           He was fully compliant with all of the conditions of

25   his bail and any requests made by Officer Jones that he report

A. 019

Carrig - Argument                    18

1    as directed.  He was available for home visits.  He readily

2    welcomed those visits.

3         Never was perceived of any danger or violent nature

4    during that supervision.  Never had any infractions.

5         So I think that is a counterbalance to the fact that

6    what -- what Mr. Musbach is accused of now happened while he

7    was on bail, but it was some time ago and he's got a track

8    record since then that I think bodes well to indicate to the

9    Court that he would, in fact, fully comply with any conditions

10   of release set by Your Honor.

11        I'm sorry if that was a little long-winded, Judge,

12   because I said I would try not to be, but I'm happy to answer

13   any questions the Court has.

14        THE COURT:  Well, I don't have any questions because

15   both of you submitted fairly extensive motions -- briefing on

16   this issue and you have addressed the concerns that I have.

17        MR. CIPPARONE:  Thank you, Your Honor.

18        THE COURT:  So, Ms. Carrig, on behalf of the

19   Government.

20        MS. CARRIG:  Thank you, Your Honor.

21        I do want to speak just a little bit about a couple

22   of the points that Mr. Cipparone raised.

23        The Government is not conceding on the risk of

24   flight issue.  We just didn't raise it.  This is not our

25   motion.

**A. 020**

Carrig - Argument                               19

1          And we understand Your Honor's previous ruling and,

2    you know, see no need to revisit it, but we do believe that

3    Mr. Musbach poses a risk of flight as we said last time.

4          And while having his -- you know, his monies watched

5    over by his parents certainly can reduce that risk of flight,

6    now he's also in a position where he's had a -- you know, a

7    chance to experience what -- what jail is like and that may

8    provide more of an incentive to flee, so I don't -- you know,

9    I don't think that we end up any differently.  The Government

10   does see him as a risk of flight, but, again, this is not our

11   motion and we understand Your Honor's ruling previously.

12         With respect to the expert report, I found that

13   report troubling on many -- on many levels.  It looks to me as

14   if the psychologist had just examined Mr. Musbach on one day

15   and then wrote the report and sent it up the very next day.

16         As I pointed out in my brief, he found Mr. Musbach

17   to be defensive and, you know, hiding of information.  Things

18   that, you know, ordinary people would have no problem freely

19   admitting.

20         I found it concerning because I've had a chance to

21   look through the County case against Mr. Musbach and IRC

22   charts, which is the chat room that Mr. Musbach was speaking

23   with our victim on, and, you know, talking about masturbating

24   and, you know, all sorts of other things.

25         They were also having conversations about other

**A. 021**

Carrig - Argument                    20

1    children on there.  They refer to a child who they both call

2    Jeda, it's J-E-D-A, who they identify as an 11-year-old.

3                Our agents have had an opportunity to interview

4    another person who's discussed on that chat who we've

5    identified as a nine-year-old that they're discussing, so it's

6    not that we're seeing these other kids speaking.  We only have

7    the chat between Mr. Musbach and our victim, but there are

8    other names that are coming up in those chats and we're

9    identifying those as minors.

10               So I just -- you know, like just because we don't

11   have evidence affirmatively showing that there was abuse

12   doesn't mean that there wasn't or that there wasn't, you know,

13   other interest in minors.  I actually think to the contrary,

14   but I can't prove that to you as this time, Your Honor.

15               We're continuing to investigate and, as I said, we

16   interviewed one of those -- those children whose name was

17   interviewed -- or whose name was mentioned and, you know,

18   found out he was nine-years-old at the time.

19               That child also did say that he saw that Mr. Musbach

20   was arrested for this particular offense.  He knew our victim

21   in this particular case.  That they had chatted and he said

22   that Mr. Musbach told him to keep his mouth shut and that

23   would have been post his investigation with respect to the

24   Atlantic County case, not this case, so, you know, back in

25   2016, I assume, Your Honor.  I don't have all of those details

Carrig - Argument                    21

1    yet.

2            So I just don't think that that -- that the

3    psychologist had all of the tools at his disposal to really

4    understand who Mr. Musbach was and what his offense conduct

5    was.

6            That being said, I think that that's one of the

7    things that makes Mr. Musbach dangerous.  He's clearly a smart

8    man.  He clearly has, you know, good family support.

9            He's very able to disguise his problems, his very

10   dark thinking.  And I think it's really -- I mean, maybe

11   that's just his intelligence that he's able to do that, but he

12   was living with his partner at the time he committed both of

13   these offenses.

14           Now, granted they -- you know, according to Mr.

15   Williams' previous testimony, they were just roommates at that

16   time, but still that -- that involves, you know, a significant

17   amount of deception.

18           His parents, I can't imagine that they knew any of

19   this was going on either.

20           And he clearly was deceptive with the psychologist

21   in saying that he was unaware of ages.  As I said, the chats

22   are pretty clear as respect to, you know, like Jeda's

23   explicitly mentioned to be nine-years-old are -- Mr. Musbach

24   later admitted knowing how old the victim was in this offense.

25           And you can see by his conversations with -- with

**A. 023**

Carrig - Argument                    22

1   our website he knew he was a -- you know, a 13-year-old child

2   at the time the offense was committed.  So I think that just

3   is concerning that Mr. Musbach is able to hide his dark

4   impulses and his thinking from the people that he's closest

5   to.

6           And that kind of brings me back to the reason why I

7   think that detention is necessary in this case.  I think that

8   he's a hard man to know, to read, to understand.

9           By all rights he looks like a -- you know, he looks

10  like he should be a law-abiding citizen.  He had a good job.

11  He had everything together.

12          And yet when you -- when you look underneath it all

13  it was some of the darkest conduct that I have ever seen and I

14  -- you know, I'm really troubled by that.

15          I don't know how we control somebody like that.  I

16  really think it's a fallacy to think that Pretrial Services

17  can monitor every single thing that Mr. Musbach would be doing

18  on the Internet or any place where there would be Internet

19  access in the house.

20          So, you know, I rely primarily on my brief.

21          I did want to say one other thing that I should have

22  addressed and I didn't think to.  I reached out to the Salem

23  County Jail and spoke with Michelle, a woman who is in their

24  Health Services, just to find out how things were going with

25  COVID there at Salem County.  Usually, you know, our detainees

Cipparone - Argument                          23

1   are in the Bureau of Prison and so we can see what's going on.

2   I didn't have a website.

3          When I spoke with her she said, knock on wood,

4   things are going exceptionally well at Salem County.  They

5   have had zero cases in their general population.  She said

6   that they are undergoing a very rigorous screening process

7   there with medical isolation quarantines as people are moving

8   into the institution.

9          And she also was able to tell me that the staff is

10  starting their vaccination.  She herself had been vaccinated

11  her first dose and they're moving through.

12         She did not have a date as to when the inmates would

13  start being vaccinated, but she was very positive about the

14  way that they are able to contain COVID and their efforts

15  there at Salem County Jail.

16         So for all the reasons that are listed in our

17  complaint and, as I explained in my brief, you know, the

18  Government sees Mr. Musbach as a danger to the community and

19  we're seeking his continued detention.  Thank you.

20         MR. CIPPARONE:  And, Your Honor, if I could respond

21  briefly?

22         THE COURT:  Yes.  Go ahead.

23         MR. CIPPARONE:  Thank you.

24         Ms. Carrig just focused a lot on age of people that

25  Mr. Musbach was interacting with, one, and I would request the

A. 025

1   Government at some point to provide me whatever documents it

2   has from his underlying cases because I don't think I was

3   provided those things in discovery, but that's an aside.  I'm

4   just -- while I'm thinking of it I'm making that request of

5   Ms. Carrig.  I'll follow up, but I don't have that stuff.

6           But the Government's emphasis for most of this

7   argument was -- and I don't mean this disrespectfully -- an

8   appeal to the emotional aspect of the fact that there were

9   minors involved in the -- one minor, frankly, involved in the

10  prior offense and I don't think that should sway the Court

11  because that's not the focus of the prior case with respect to

12  other people.

13          And the Government, I guess, devalues the Avenel

14  report by saying it was a one-day evaluation.  That's what

15  those people do.  That's what the doctor who did that

16  evaluation does.  He did it for the Court.  It was acceptable

17  to the State Court.  It was relied upon by the State Court.

18  It was relied upon by the Prosecutor in that case.

19          And it was determined that Mr. Musbach is not a

20  sexual predator and was not in need of the kind of treatment

21  that is afforded to sexual predators at Avenel and that's done

22  in the state system every day.  The Court's rely on that

23  expertise and that's the conclusion of that report.

24          Notwithstanding that, the examiner was no idiot

25  because the examiner perceived apparently what Ms. Carrig

1    highlighted which is some element of, you know, not being

2    forthcoming.  Whether you call it deceptiveness or failure to

3    be forthcoming or defensiveness, that examiner was aware of

4    that.  They're adept at ferreting that out and they still make

5    their analysis understanding of that.  So I think the Court

6    should give it the weight it's accorded with respect to its

7    conclusion.

8             I do think that when Ms. Carrig says, you know,

9    Pretrial Services can't -- can't watch everything Mr. Musbach

10   does on the Internet, I've asked the Court to order that he

11   not do anything on the Internet.  I'm not asking Pretrial to

12   monitor what he does.  I'm asking him to be ordered not to

13   have it.

14            And, frankly, Mr. Williams is a law-abiding citizen

15   and if he represents to the Court that he will make sure that

16   Mr. Musbach does not have access, he will do his best to do

17   that.

18            Now, I also note that Mr. Williams works at home.

19   He works two jobs.  I don't want to mention what they are

20   because the last time I think he was terminated because of the

21   negative PR from this matter, so I don't want to mention

22   where, but everybody is aware of where he works and I know he

23   did advise Pretrial Services of his employment status.

24            But he works from home, so it's not like he'd be

25   leaving Ms. Musbach unattended.  And I don't mean to make it

Cipparone - Argument                    26

1   sound like a babysitter.  I'm just indicating to the Court
2   there will be somebody there with Mr. Musbach the entire time
3   he's there because even when Mr. Williams is working in this
4   one bedroom apartment he's going to be able to see everything
5   Mr. Musbach is doing and I think that's significant.
6           And his parents are across the hall as well, so
7   there would be a great tag team effort with three people who
8   care about Mr. Musbach who are putting their money on the
9   line, their reputations on the line and they're all three very
10  serious, law-abiding citizens that I think is a major
11  indicator to the Court that they believe in Mr. Musbach's
12  ability to comply with the Court orders and they're willing to
13  put their money where their mouth is and their reputations
14  where it is as well.
15          And I submit to the Court Your Honor should look at
16  that significantly in favor of release.  Thank you, Judge.
17          THE COURT:  I have to admit that I am struggling
18  with this one and the struggle is the nature and circumstances
19  of the offense.  That's the struggle.
20          The offense is a murder-for-hire.  Like, how do you
21  -- what conditions can be set to reasonably assure the Court
22  that someone who's engaged in that kind of behavior at the
23  level the defendant engaged can -- does not pose a danger?
24          So that is the struggle, right?  Because it's not
25  like he just went out and shopped, as truly problematic or

Colloquy                                27

1    troublesome as that may be, but took several steps beyond
2    securing the idea and never really backed off until the person
3    on the other end revealed him or herself.
4            And it's just really, really tough to -- for me to
5    reasonably assure me that that kind of danger can be managed
6    by Pretrial Services.
7            And let's be honest, you have the recommendation.
8    Pretrial Services has recommended to the Court detention
9    because they are the experts, right, on conditions and the
10   kinds of conditions that can help the Court find conditions of
11   release or a combination of conditions and they have not done
12   that.
13           Now, their recommendation, of course, is not binding
14   on the Court.  And I'm sure you can talk to any of the
15   officers and know that there have been times where I don't
16   necessarily agree with what they say.  I acknowledge their
17   expertise.  However, you know, the decision is mine about what
18   kind of conditions assure me the danger is minimized.
19           The Government moved for risk of flight.  I don't
20   think that that's impacted, but I will say this, these
21   conditions that are being proposed now certainly go to
22   minimize risk of flight.  So it's not the absence of risk,
23   right?  That's impossible.  There's always a risk.
24           I'm not looking for the absence of risk or the
25   absence of danger.  It's reasonable assurance.  That's what

**A. 029**

Cipparone - Argument                    28

1    the statute says.  I've got to be reasonably assured that he

2    will not flee and he will not engage in behavior that's

3    dangerous to others in the community.

4              MR. CIPPARONE:  Can I make one more point?  I don't

5    mean to interrupt, Your Honor, I'm sorry.  Can I make another

6    point related to what Your Honor said on dangerousness that I

7    didn't?

8              THE COURT:  Sure.

9              MR. CIPPARONE:  So, one, obviously, the burden is

10   clear and convincing and that rests with the Government.  That

11   wasn't the point I primarily wanted to make.

12             And, Your Honor, will understand this in the context

13   in which it's intended.  The alleged incentive for this

14   murder-for-hire at the time, you know, almost five years ago

15   now, four and a half, whatever it is, was to theoretically

16   silence a potential witness against Mr. Musbach that was

17   circumstantial, meaning -- not in the way we use

18   circumstantial evidence, meaning relevant to the circumstances

19   that they existed at that time.

20             It's clear that this now adult, but young man, I'll

21   call him, is not a necessary or essential witness in this

22   case, right.  This is not about any particular witness.  The

23   Government's case is not based on that.  That -- that

24   motivation -- and, again, this is contextual argument, that

25   motivation doesn't exist.

**A. 030**

Cipparone - Argument                    29

1          And to the extent it did and that it was visceral,

2    even though over the period of potentially months, if you

3    accept the Government's proffer, and the complaint affidavit

4    at its face value for now, doesn't exist now.

5          And a lot of circumstances have changed, not the

6    least of which is Mr. Musbach was completely law-abiding after

7    this.  That motivation dissipated.  He never picked it up

8    again and there's no -- there's no similar motive here.  There

9    is not a witness that will provide a smoking gun evidence

10   against Mr. Musbach.

11         This is a, for lack of a better term, a paper case.

12   The Government is attempting to prove its case ultimately

13   through the paper trail and the money trail, not the witness

14   trail.

15         While the motive relates to the alleged victim,

16   that's just the backdrop against which this occurred.  That

17   victim of the first offense and the attempted victim,

18   according to the Government, of this offense is not anywhere

19   near a necessary witness.  The Government could easily present

20   it's case without that person every hitting the courtroom and

21   I think that's important for the Court to consider as well in

22   terms of motivation to act.

23         THE COURT:  No, except that the motivation could

24   have been to avoid jail, right, and that motivation still

25   exists.

1              MR. CIPPARONE:  Well, that -- but that exists in

2     every single case, Judge, and I understand that, but --

3              THE COURT:  Yes, but --

4              MR. CIPPARONE:  Meaning if that were --

5              THE COURT:  Pause.  Murder-for-hire does not.

6              MR. CIPPARONE:  Agreed.  I'm not -- I'm not

7     diminishing the -- the charges here.

8              I just think that these conditions are so tight and

9     frankly I really -- and it took awhile to put this motion

10    together because along with Mr. Musbach's family and Mr.

11    Williams and Mr. Viola I really took a lot of time to try to

12    think of every condition I could pose to the Court.  These are

13    probably the most restrictive conditions I've proposed to a

14    Court let's say in a long time because I can't remember

15    proposing more restrictive conditions.

16             So I do think they're significant and I do

17    appreciate the Court's candor in saying it's struggling and I

18    think that's for good reason.  I think these do present a

19    viable alternative.

20             And, again, if you -- as I know Your Honor is, and

21    you've already said, is mindful of that kind of

22    liberty/detention balance and that the Act favors -- favors

23    release, I think that pushes it over the edge respectfully,

24    Your Honor.

25             And I was sorry to interrupt.  I just wanted to make

Carrig - Argument                                      31

1    those couple of extra points.

2              MS. CARRIG:  Your Honor, if I may?

3              THE COURT:  Yes.

4              MS. CARRIG:  I appreciate Mr. Cipparone's points as

5    always, but we will call the victim of this offense, or at

6    least one of his family members depending on availability, so

7    I just don't see that.  I do think that that is a witness

8    that's necessary to tee up the motive of the case.

9              And Your Honor is stuck on the fact that this is --

10   you know, this is a very serious crime.  It's a murder-for-

11   hire.  We're stuck on that too.

12             He went onto the dark web.  He converted cash into

13   crypto currency.  He did this over a period of months, you

14   know, starting in September of 2015 and continuing onward.  He

15   paid $20,000.

16             That the whole thing was a obstruction of justice.

17   The whole point of this murder was that he was going to kill

18   the witness against him to save himself from jail.  Who was

19   the witness?  He was a 14-year-old kid.  Like, it just gets

20   more and more depraved as you look at this.

21             And when you add on top his mental health conditions

22   and some of his other personal factors we just believe that

23   there is a very serious risk of danger that we are showing by

24   clear and convincing evidence that there are no combination of

25   conditions that will insure the safety of the community.

**A. 033**

The Court - Decision                    32

1          THE COURT:  Let me get a breakout room with Pretrial

2    Services.

3                    (Pause in proceedings)

4          THE COURT:  All right.  As counsel understands, and

5    hopefully client as well, there are four specific factors that

6    the Act requires me to consider in determining whether there

7    are conditions or combination of conditions that will

8    reasonably assure that the defendant doesn't pose a risk of

9    danger or flight.  And the burden on the Government differs

10   for both, preponderance of the evidence for flight and clear

11   and convincing for danger.  And so I've already noted that

12   this is a very difficult analysis for the Court.

13         MS. CARRIG:  Your Honor --

14         THE COURT:  Yes.

15         MS. CARRIG:  -- Mr. Cipparone is motioning that he's

16   having a hard time hearing.

17         MR. CIPPARONE:  Your Honor, I sorry, I can't hear.

18   I don't know if you can hear me.

19         THE COURT:  I can hear you.  You can't hear me?

20         MR. CIPPARONE:  I'm trying to get my sound back.

21   I'm sorry.

22         THE COURT:  Okay.

23         MR. CIPPARONE:  I may have to disconnect and

24   reconnect.  I'm sorry.  I'll do that right away.  For some

25   reason I lost the audio.

The Court - Decision                          33

1          COURTROOM CLERK:  No problem.

2          THE COURT:  Okay.

3                    (Pause in proceedings)

4          MR. CIPPARONE:  I can hear now, Judge.

5          THE COURT:  Okay.

6          MR. CIPPARONE:  Sorry about that.  I apologize.

7          THE COURT:  We all have to make adjustments given

8     these new methods of work.

9          As I indicated, I now turn to the factors that the

10    Court must consider, or that the Act requires me to consider,

11    on whether or not there are conditions or a combination of

12    conditions to reasonably assure defendant doesn't pose a risk

13    of flight, that the defendant won't flee really and whether or

14    not the defendant poses a danger.

15          The struggle that I'm having really is all around

16    the nature and circumstances of the alleged offense, the

17    weight of the evidence against the defendant, so those are the

18    first two prongs.  The nature and circumstances of the alleged

19    offense and the weight of the evidence against the defendant.

20          Those two things by themselves militate in favor of

21    detention and that is the difficulty here with evaluating and

22    analyzing this case.

23          And the struggle that comes to me -- there's a

24    balance.  This defendant was out under supervision for about

25    five years between the time this conduct happened and his

**A. 035**

1    initial appearance before this Court in August.  And I don't

2    want to ignore that or somehow minimize that to suggest it

3    doesn't a matter.  It does matter and that's what the struggle

4    has been with the Court.  So we have five years of supervised

5    release and this defendant hasn't engaged in any behavior

6    observed to violate his conditions, right?  But then that

7    takes me back to the factors.

8           And while I do not think that incarceration is an

9    answer to mental health, I do think in a case like this I have

10   to be mindful of the mental health components of this

11   particular defendant when the nature and circumstances of the

12   offense and the evidence to support that relates directly to a

13   murder-for-hire of a child.  That's -- that's the struggle.

14   What kind of conditions -- combination of conditions could

15   reasonably assure that behavior?

16          Now, you have that and then put on top of that the

17   mental health components which I cannot ignore.  One of those

18   is this deception noted by the psychologist.  Yes, the psych

19   exam, the Avenel exam, is required, it goes forward and it's

20   -- the report reads as it reads, but there's deception noted.

21   That's a mental health component.  The calculated secretive,

22   dark web steps.  That's deception.

23          And so factor three is the history and

24   characteristics of the defendant and that's why I get into

25   physical and mental condition.  I am permitted to take into

1    account the mental health aspects of this defendant, the

2    nature and seriousness of dangers to the others of the

3    community and that goes to, you know, likelihood of engaging

4    in deceptive, manipulative behavior that is directed at

5    harming not just a child, but anyone.

6           Given that analysis, given what I have truly

7    evaluated and analyzed on whether or not there's a combination

8    of conditions to reasonably assure that this defendant doesn't

9    pose a danger I have to answer that question in the negative.

10   I do believe he poses a danger and that detention is the

11   appropriate outcome in this case.

12          I will also say that I -- you know, I'm a parent

13   myself.  I have friends myself.  And I certainly understand

14   that the third party custodians are willing to go to the

15   extreme, I will say, to provide the assistance and assurance

16   that I'm looking for and I just hope that that support

17   continues because this is a journey.  It's a marathon, not a

18   sprint.

19          And so I do hope that you all continue to support

20   this defendant, but at this point I have to make my judgment

21   based upon the information available to me, all of the

22   circumstances and information and I find for detention.

23          I find that the defendant has -- the Government --

24   the Government has met its burden by clear and convincing

25   evidence that detention is the right result in this case at

                         The Court - Decision                    36

1   this time.

2              There's also the process available.  I certainly --

3   Mr. Cipparone knows I'm not -- I'm not shy about having --

4   having my decisions reviewed by higher authority.  It's a

5   close enough call that I just want to make sure you understand

6   I'm -- no personal feelings about having a review of this

7   decision if that's what you choose to do.

8              MR. CIPPARONE:  Thank you, Your Honor.  And, of

9   course, I know that.

10             THE COURT:  I know you do, but I still, for a

11  complete record, make sure that nothing changes.  I am who I

12  am and have been always.

13             So -- but, again, like I said because of the

14  closeness of this, you know, if you all think that I've missed

15  something, made an error, then I will not be insulted or

16  otherwise question such a determination.

17             Anything further on behalf of the defendant?  It's

18  your motion.

19             MR. CIPPARONE:  No, Your Honor.  Thank you.

20             THE COURT:  Anything further on behalf of the

21  Government?

22             MS. CARRIG:  No, Your Honor.  Thank you.

23             MR. CIPPARONE:  I'm sorry, Judge.

24             THE COURT:  The order for detention --

25             MR. CIPPARONE:  The sealing motion.

**A. 038**

The Court - Decision                    37

1          THE COURT:  Oh, right, and I did have -- that was
2     one things I kept circling back to.  I'm granting the motion
3     to seal given the medical information that it contains.
4          MR. CIPPARONE:  Thank you, Your Honor.
5          THE COURT:  And my Courtroom Deputy just reminded me
6     as well, so we wouldn't have gotten far.  The motion to seal
7     is granted.  It's healthcare -- health information and those
8     are routinely granted confidential status.
9          MR. CIPPARONE:  Thank you, Your Honor.
10         THE COURT:  You're welcome.  This matter's
11    adjourned.  The order of detention will continue.
12         MR. CIPPARONE:  Have a good day everyone.
13         MS. CARRIG:  Thank you.  You too.
14         THE COURT:  All right.  Thank you.
15              (Proceedings concluded, 3:02 p.m.)
16                         * * *
17
18
19
20
21
22
23
24
25

**A. 039**

38

1                     **C E R T I F I C A T I O N**

2

3          I, Joan Pace, court approved transcriber, certify

4    that the foregoing is a correct transcript from the official

5    electronic sound recording of the proceedings in the above-

6    entitled matter.

7

8

9    ____/s/Joan Pace_____       February 4, 2021

10   JOAN PACE

11   DIANA DOMAN TRANSCRIBING, LLC

| | **ATLANTIC COUNTY PROSECUTOR'S OFFICE** *INVESTIGATION REPORT* | *Page 1 of 3* |
|---|---|---|

| 1. Unit COMPUTER CRIMES UNIT | 2. Unit File # ACPO160127 | 3. Promis Gavel # |
|---|---|---|

| 4. Case Agency(s) |
|---|

| 5. Crime END WELFARE CHILD | 6. N.J.S. | 7. Date 01/29/2016 | 8. Time 12:00 AM |
|---|---|---|---|

9. Location of Crime
1). Incident date & Time: (03/31/2016 12:00 AM - );
Address: 802 BLUE TEAL DR GALLOWAY, NJ 08205;
2). Incident date & Time: (08/27/2015 12:00 AM - 08/27/2015 12:00 AM);
Address: 223 W DAWES AVE SOMERS POINT, NJ 08244;

10. Person Reporting Incident / Crime:

| 11. Suspect(s) 1). MUSBACH, JOHN M | 12. Person Info(s): 1). SSN: ▮▮▮▮;DOB: ▮▮▮▮;SEX: MALE; RACE: CAUCASIAN; | 13. Address(s): 1). 223 W DAWES AVE Somers Point, NJ 08244 ATLANTIC, SOMERS POINT CITY |
|---|---|---|

| 14. Victim(s): | 15. Person Info(s): | 16. Address(s): |
|---|---|---|

| 17. Stolen / Missing Property: | 18. Weapon Used: |
|---|---|

**NARRATIVE**

On 3-31-16 at approximately 0950 hrs. Detective Stan Yeats, Detective Aliya Simnor, Det. Carlton Durham, Det. Michael Peterson, Det. Christopher Southard, Det. Bryan Casey (Galloway P.D.), Det. Jason Kiamos (Galloway P.D.), Det. Bill Schroer (Galloway P.D.) and I executed a search warrant on 802 Blue Teal Drive Galloway, NJ 08205. We all approached the residence and I knocked on the front door and rang the doorbell numerous times, but no one came to the door. After waiting for approximately 40 seconds I tried the door handle and it was unlocked. We then made entry and began to check the house for occupants. As we did so, we shouted "Police, Search Warrant". I proceeded directly up the stairs and to the front left bedroom door. It was shut and I opened it and discovered John Musbach lying in bed appearing to just have woken up. I ordered him to show me his hands and asked him if anyone else was home. He was then afforded the opportunity to put on some pants before we proceeded downstairs to the dining room.

Det. Michael Peterson, John Musbach, and I then sat at the dining room table and began the interview process. A brief synopsis of the interview is as follows:

- Mr. Musbach was Mirandized by me and he agreed to waive his rights and speak with us.
- Mr. Musbach was initially asked why he thought we might be in his house and he stated he had no idea.
- Mr. Musbach was then told that I was part of the Internet Crimes Against Children (ICAC)

| Reporting Detective RICHARD JOHANNESSEN | Reporting Detective Signature | Date of Report 04/04/2016 | Supervisor Signature |
|---|---|---|---|

**A. 041**



**ATLANTIC COUNTY PROSECUTOR'S OFFICE**
*INVESTIGATION REPORT*

*Page 2 of 3*

| | Case# | ACPO160127 | Promis Gavel# | |
|---|---|---|---|---|

Task Force and that we investigate crimes against children online. He was told that an ICAC tip lead us to his house and again asked if he had any idea why we were here to talk to him.

- He stated that it could be because of someone he met online by the name of J█ R██████. He stated he has not had contact with this person for a couple of months and that he lived in NY State.
- He stated the victim introduced himself to him on the IRC network and they began communicating there. He stated that the victim stated he was 17 or 18 when they initially began to chat, but then later told him he was 13.
- He stated when they initially began to communicate the conversations were computer related. He stated the conversation eventually lead to a sexual nature.
- He stated that the victim sent him approximately 4 naked pictures and at one point he referred to them as "dick pictures". He also stated that he sent the victim a naked picture of himself.
- He stated the victim also sent him a video of himself masturbating.
- He further stated that he generated a masturbation video and sent it to the victim.
- He initially stated that he thought the victim was 17 or 18 when they traded pictures and video with the victim. He was then shown some of the printed out chats that contradicted this statement. He then admitted that he knew the victim was 13 before the trading by saying, "Yeah, I guess that is the correct order".
- He stated he deleted the video and pictures the victim sent him and that he never traded or shared them with anyone else.
- He stated that they never discussed meeting in person.
- He initially stated that the contraband items were sent to him without his request, because the victim had a "crush" on him. He was then shown some of the printed out chats he had with the victim, in particular a chat that occurred on 8-13-2015, in which he requested a picture from the victim.
- He stated his handle on IRC was "frackster" and he had sole control of that account.
- He stated they also communicated via Skype, text, and techtronix network voice over IP
- He stated he used his cell phone and his laptop to facilitate communications with the victim.

| Reporting Detective | Reporting Detective Signature | Date of Report | Supervisor Signature |
|---|---|---|---|
| **RICHARD JOHANNESSEN** | | **04/04/2016** | |

**A. 042**



**ATLANTIC COUNTY PROSECUTOR'S OFFICE**
*INVESTIGATION REPORT*

*Page 3 of 3*

| | Case# | ACPO160127 | Promis Gavel# | |
|---|---|---|---|---|

- He provided me both the passwords for his cell phone (████) and his laptop (████)
- He stated he works for a company by the name of Linode.
- He later stated that if he did communicate with the victim at work, he would have used the Linode laptop that was also seized from his bedroom.
- He further stated that when he was communicating with the victim, he would have been living at 223 W. Dawes Ave. Somers Point, NJ

At the completion of the interview I briefed Assistant Prosecutor David Ruffenach of the outcome of the interview and he authorized the arrest of John Musbach for 3rd degree endangering the welfare of a child (possession). Musbach was transported to the Galloway Township Police Department by the Galloway Police. Upon his arrival Det. Bryan Casey processed Musbach (Fingerprinted, Photographed, and took his DNA sample). I logged into the eCDR system and generated complaint summons S 2016 000146 0121 charging John Musbach with 2C:24-4B(5)(B), Endangering the Welfare of a Child (Possession of Child Abuse Material). At the completion he was served a copy of the complaint summons and notified his court date was in Somers Point Municipal Court on 4/5/16 at 5:PM. I then drove him back to his Blue Teal Drive address and he was released.

| Reporting Detective | Reporting Detective Signature | Date of Report | Supervisor Signature |
|---|---|---|---|
| **RICHARD JOHANNESSEN** | | **04/04/2016** | |

**A. 043**




## OFFICE OF THE PROSECUTOR
County of Atlantic

### DAMON G. TYNER
Atlantic County Prosecutor
4997 Unami Boulevard, Suite 2
P.O. Box 2002
Mays Landing, NJ 08330
609-909-7800-Fax 609-909-7802

Cary S. Shill
*First Assistant Prosecutor*

DAREN J. DOOLEY
*Chief of County Detectives*

Mario C. Formica
*Deputy First Assistant Prosecutor*

Diane M. Ruberton
*Deputy First Assistant Prosecutor*

April 21, 2017

Lori Morgan, PTI Director, via email and regular mail
Atlantic County Criminal Courts Complex
4997 Unami Blvd.
Suite 1
Mays Landing, N.J. 08330

      **RE: State v. John Musbach**
      **Indictment No.: 16-08-1931-D**
      **Prosecutor File No.: 16001295**

Dear Ms. Morgan:

      John Musbach (hereinafter, "the defendant") has made application to the *Pretrial Intervention Program* (hereinafter, "PTI") to dispose of the charges against him contained within the afore-mentioned indictment by way of diversion. The defendant was interviewed by the PTI Coordinator in conjunction with his PTI application. The matter was then forwarded to the Atlantic County Prosecutor's Office (hereinafter, "ACPO" or the "State") for review of the appropriateness of the defendant's suitability for admission into PTI. After a thorough and careful consideration, the State rejects the defendant's PTI application. The statutory criteria in N.J.S.A. 2C:43-12; R. 3:28, *Guidelines 1, 2, 3 and 4,* and the additional factors to be considered under the *Guidelines* were considered in the determination to reject this application.

      The afore-mentioned indictment charges the defendant with the following crimes:

      Count 1- N.J.S.A. 2C:24-4a(1)-*Endangering, Sexual Conduct,* third degree;
      Count 2-N.J.S.A. 2C:24-4b(5)(b)-*Endangering, Knowingly Possess, Views, or Has Under his Control Items Depicting Sexual Exploitation or Abuse of a Child*, third degree; and
      Count 3-N.J.S.A. 2C:34-3b(2)-*Promoting Obscene Material by Showing Obscene Material to a Person Under 18 Years of Age With Knowledge or Purpose to Arouse, Gratify or Stimulate Himself or Another When More Than 4 Years Older Than the Person Under 18 Years of Age Viewing the Material,* third degree.

      In reviewing this defendant's application for PTI, the State has considered the following facts: On or about September 17, 2015, a woman (hereinafter identified as "E.R") in Cicero, Onondaga County, New York,

1

**A. 044**

discovered sexually explicit images on her thirteen year-old son's computer (hereinafter, identified as "J.R" or "the victim"). The images were photographs of the victim where he was naked, and a video of himself engaged in a sex act. There were also reciprocal photos and images of the unknown male. Upon discovery of the images, E.R. contacted the Cicero Municipal Police Department. Officer Flansburg from that department responded to the victim's home. After making contact with E.R., she was referred to the *McMahon-Ryan Advocacy Center* [1] and the matter was then referred to the Onondaga County Sheriff's Department (hereinafter, "OCSD") for further investigation by an *Internet Crimes Against Children* (*ICAC*) Agent. Officer Shanna Stassi (hereinafter, "Ofc. Stassi") was assigned to investigate this matter. On September 23, 2015, E.R. and J.R. responded to OCSD for a meeting with Ofc. Stassi. E.R. has also brought the electronic devices that J.R. had used during the communication with the suspect. Ofc. Stassi conducted a formal interview with J.R. as to how the contact occurred between him and the suspect. J.R. advised that in early summer 2015 he had logged onto a computer "app" named *IRC*. Apparently, *IRC* is a social app where a user creates an identity name, and then can communicate with other users. While *IRC* is a social app, the victim advices that the app is a forum for bisexual males to communicate with one another. *IRC* is accessed via a cloud. Once the users connect in the social area of the app, they can then enter into "private chat rooms" where they can communicate with one another privately. Therefore, a user may logon with his username from any internet capable electronic device. The victim advised Ofc. Stassi that he used his i*Phone 6, iPad, Raspberry Pi,* laptop and *Microsoft Surface Tablet* to access the *IRC* app. Shortly after joining *IRC*, the victim met the defendant. After meeting one another, J.R. and the defendant entered into a private chat room and exchanged other contact information so that they could communicate with one another through a variety of applications and devices, including text messaging. Initially, J.R. and the defendant discussed computer related topics. After approximately one month, the defendant began to divulge personal information about himself to the victim. The defendant told the victim his proper name, age (twenty years-old), sexual disposition, his place of business and living arrangement. The victim was not certain if he had told the defendant that he was sixteen years old, or his actual age. When the victim advised that he was also unsure about his sexual disposition, the defendant asked him if he wanted to experiment. In late August 2015, the victim and the defendant provided pictures of themselves naked, and engaged in sex acts with each engaged in a sex act. The defendant sent a picture of his penis to the victim through his *Dropbox* account. The victim advised Ofc. Stassi that the only device that should have any of the sexual images exchanged between he and the defendant should be the cell phone. The defendant requested the victim's home address claiming that he could send him stuff from his place of business, a computer company. The victim did not provide the defendant with his address, but did submit directly to the business website. When the officer looked up the name of the company that employed the defendant, he was listed as a customer support specialist, and provided a physical location on Jimmie Leeds Road in Galloway Township, New Jersey. The victim and defendant would also play a popular videogame with one another via the internet. The following day, Ofc. Stassi conducted logical and forensic exams of the victim's cell phone. The sexually explicit photo that the defendant sent to the victim through *Dropbox* was discovered in the *IRC Cloud* associated with the *Dropbox* link. During this investigation, the defendant was contacted by the police department. The defendant was made aware of the investigation and advised that he should not contact the victim, as he was in fact thirteen year-olds. On September 29, 2015, the victim had accessed *IRC* for the first time since the investigation into the matter had occurred. The victim discovered that there were several communications to him that were sent by the defendant. The victim forwarded the contacts to his mother, and the contacts were then sent to Ofc. Stassi. In the messages, the defendant notes that he was contacted by the police. The defendant also acknowledged that he was aware that the victim was thirteen-years old. Furthermore, the defendant instructed the victim to remove the pornographic photos from his phone so that his parents would not find the photos. Ofc. Stassi was also able to retrieve the

---

[1] The *McMahon-Ryan Advocacy Center* is located in Syracuse, NY. The Center is  a child advocacy center that supports child abuse victim's, their non offending care givers, and law enforcement agencies investigating any type of child abuse.

A. 045

communications, videos, and pictures that the victim sent to the defendant, and the images and videos that the defendant had the victim send to him. An examination of the electronic devices was concluded. The only device that had evidentiary value was the *iPhone6*. Ofc. Stassi continued to investigate the matter in order to refer the matter to the originating jurisdiction of the defendant. Officer Stassi then contacted *ICAC* agent, Sergeant Richard Johannessen (hereinafter, "Sgt. Johannessen") with ACPO. Sgt. Johannessen reviewed the information that was provided from Ofc. Stessi. As a result, a subpoena was served upon the defendant's email address, identified as *Google*. The information obtained from *Google* identified the defendant as accessing the email through internet addresses controlled by the defendant's place of business and *Comcast*. The subpoenas further revealed that the *Comcast* locations had a local location of 223 W. Dawes Avenue in Somer's Point. A law enforcement information search provided a local address for the defendant at the same address in Somer's Point. A further *Department of Motor Vehicle Commission* (hereinafter, "*MVC*") search indicated that the defendant had previously lived at the address in Somer's Point, but had recently relocated to 802 Blue Teal Drive in Galloway. The *MVC* search indicated that the defendant owned a Silver 2008 *Toyota RAV*, and provided the license plate number for that vehicle. On March 7, 2016, Sgt. Johannessen drove past the home located in Galloway and identified that a Silver 2008 *Toyota RAV* with the identical license plate as provided by the *MVC* was located in the driveway of the home. Based upon the information that was obtained by Sgt. Johannessen, an application for a  search warrant was made for the home in Galloway. The search warrant was approved and was ultimately executed by several ACPO detectives and members of the Galloway Township Police Department (GTPD) on March 31, 2016.  The defendant was located in his home and agreed to answer the detectives' questions pursuant to a *Miranda Warning*. Sgt. Johannessen identified himself as a member of the *ICAC Task Force*. The defendant admitted that he knew the victim, and that the victim lived in New York State. The defendant also admitted to continuing his contact with the victim after learning that the victim was thirteen years-old. The defendant also admitted to sending and receiving the afore-mentioned pictures and videos to the victim. The defendant confirmed his username on *IRC*, and that he had sole control of the account. The defendant confirmed that he and the victim had communicated through other applications, by *Skype* and text message. The defendant advised the detectives which electronic devices he had used to communicate with the victim, and provided the passwords to the devices. At that time, the defendant was placed under arrest and taken to the GTPD for processing A subsequent forensic search of the electronic items that were seized by the defendant was performed. A *MAC Notebook* was the only device that was found to contain items of evidentiary value. The evidence obtained from that device was consistent to the images, videos and conversations that were obtained from the victim's cellular telephone. The defendant was subsequently indicted by an Atlantic County Grand Jury on August 25, 2016. Thereafter, the defendant applied for PTI.  The PTI Director reviewed the defendant's application. On November 17, 2016, the PTI Director denied the defendant's application, and a thorough letter of denial was issued on the same date. ACPO also carefully reviewed the matter and concurred with the denial of the defendant's PTI application. In response to the denial, the defendant submitted a *Statement of Compelling Reasons* to the PTI Director on December 29, 2016, to reconsider the defendant's application. After, an additional review of the defendant's application and the *Statement of Compelling Reasons*, the PTI Director again rejected the defendant's application. The State has also reviewed the defendant's application to PTI and the *Statements of Compelling Reasons* that were provided on his behalf. For the reasons that follow, the State denies the defendant's PTI application.

The statutory criteria in N.J.S.A. 2C:43-12(e); and R. 3:28, *Guidelines 1, 2, 3 and 4*, and the additional factors to be considered under the *Guidelines* were considered in the determination to reject the defendant's PTI application. PTI provides the opportunity for defendants to avoid the ordinary course of prosecution by providing the opportunity for early rehabilitative services when such services can reasonably be expected to deter future criminal behavior when there is a causal connection between the offense charged and the need for

3

**A. 046**

rehabilitation, without which the crime and the prosecution might not have occurred. The program provides an alternative to prosecution when defendants may be deterred from future criminal acts by the alternatives provided. PTI provides an alternative mechanism for prosecution in "victimless" crimes, and can provide relief to the criminal court docket for those types of crimes. PTI seeks to provide deterrence of future criminality by placing a defendant in supervisory treatment. In reviewing this matter, the State notes that the nature of this case is an *Endangering the Welfare of a Child* matter, where the victim is a thirteen year-old minor. The defendant claims in his PTI application and following *Statement of Compelling Reasons* that he did not know that the victim was a minor when he sent the pictures. This is in direct contrast to the defendant's statements to the police officers upon his arrest. The defendant had always believed that the victim could have been seventeen. The defendant took no measures to ensure that the person that he was sending the pictures to and receiving pictures from was a legal adult. The defendant took no immediate remediate measures when he did learn that the victim was a minor. In fact, upon confirmation that the victim was a minor and receiving instructions to not speak with the victim, the defendant contacted him and told him to delete the pictures of the defendant that he knew were on the victim's phone. The defendant's actions were self-serving and an attempt to have the victim destroy evidence of the defendant's criminal actions. This fact weighs heavily in considering the defendant's suitability for PTI in the instant matter. As noted by *Guideline 1*, PTI is generally granted to defendants whose crime did not produce an identifiable victim. In this matter, J.R. is a clear victim. The victim's mother opposes PTI in this matter. The victim's mother notes that she believes that the defendant should receive some form of punishment. The mother notes that the victim was traumatized by this matter, as he was confused by his sexuality and was too embarrassed by the facts of the incident to have a meaningful discussion with his therapist. Despite the defendant's assertions, the victim's mother is not advocating for jail for the defendant; nor is she opposed to her son's sexuality, only that he has been confused about his sexuality as a result of the incident. As the victim's mother has noted, the defendant forced the victim to be in a situation that no thirteen year-old child should have to be placed into. The victim's input as to the disposition of a matter through PTI is a legitimate factor for the State to consider when determining the appropriateness of a defendant for PTI. State v. Hoffman, 399 N.J. Super. 207, 215-216 (App. Div. 2008).  The fact that there is an identified victim in this matter that has suffered harm, and is opposed to admitting the defendant into PTI is a legitimate concern for the State to consider in PTI admittance. Thus, under this *Guideline*, the defendant is not an appropriate candidate for PTI.

As per *Guideline 2*, the State does not find that the *Statement of Compelling Reasons* that were submitted by the defendant provide any compulsiveness to warrant the defendant's entry into PTI. Although the defendant was not assessed to be a sexual predator, the fact is that despite that classification, he still did commit the instant crimes. The fact that the defendant contacted the victim after he was contacted by the police and told not to do so, and advised that the victim was thirteen years-old, is concerning. The State is further alarmed by the defendant urging the victim to destroy evidence. The defendant's actions and the overwhelming assessment of the defendant that he lacks insight and is immature, is worrisome to the State. The State is concerned that the defendant has not appreciated the seriousness of his prior actions, and will not be deterred from future similar criminal actions. The defendant has yet to offer remorse for his actions. The defendant continually excuses his conduct with his assertion that he believed the victim to be a legal adult. Despite the defendant learning that the victim was a minor, he has never offered remorse or regret. As the defendant is unable to advance his argument for PTI under *Guideline 2*, and there is a rebuttable presumption against admission in this type of crime, the defendant should be denied from PTI.

Taking into account the purpose of PTI in considering *Guideline 3,* criteria, the State will note the factors to be considered under this guideline are: (1) the nature of the case; (2) the facts of the case; (3) the

4

**A. 047**

motivation of the defendant; (4) the desire of the victim to forego prosecution; (5) the existence of personal problems and character traits which may be related to the applicant's crime and for which services are unavailable within the criminal justice system, or which may be provided more efficiently through supervisory treatment and the probability that the causes of criminal behavior can be controlled by proper treatment; (6) the likelihood that the applicant's crime is related to a condition or situation that would be conductive to change through his/her participatory in supervisory treatment; (7) the needs and interest of the victim and society; (8) the extent to which the applicant's crime constitutes part of a continuing pattern of behavior; (9) the applicant's record of criminal and penal violations and the extent to which he/she may present a substantial dangers to others; (10) whether or not the crime is of an assaultive or violent nature, whether in the criminal act itself or in the possible injurious consequences of such behavior; (11) consideration of whether or not prosecution would exasperate the social problem that led to the applicant's criminal act; (12) the history of the use of physical violence of others; (13) any involvement of the applicant with organized crime; (14) whether or not the crime is of such a nature that the value of supervisory treatment would be outweighed by the public need for protection; (15) whether or not the applicant's involvement with other people in the crime charged or other crime is such that the interests of the State would best be served by processing his case through traditional criminal justice system procedures; (16) whether or not the applicant's participation in pretrial intervention will adversely affect the prosecution of codefendants; and (17) whether or not the harm done to society by abandoning criminal prosecution would outweigh the benefits to society from channeling an offender into a supervisory treatment program. In analyzing the factors, the State notes that some of the afore-mentioned factors are not applicable in this matter. The State has no information as to any treatment or care that the defendant is receiving for any issues, nor how any potential treatment would be likely to thwart future criminal behavior. The defendant was assessed by two mental health professionals, but there is nothing to suggest that the defendant continues with any type of counseling for his behavior. There are no codefendants in this matter, nor are there any other pending criminal charges that would be affected by the resolution of the defendant's current charges. The State has no information to suggest that the defendant is involved in any organized criminal activity. However, this crime is one of violence, for which there is a rebuttable presumption against admitting the defendant into PTI. The defendant's reasons for overcoming the presumption against admittance into PTI are not persuasive. The State agrees that the instant matter is the defendant's first contact with law enforcement. The State again notes the victim's opposition to the defendant's entry into PTI, and that this is an appropriate objection for the State to consider when deciding if a defendant should be enrolled into PTI. Notice to this defendant that the police had begun an investigation, knowledge of the age of the victim, and a warning by the police to not contact this victim had no deterrent effect upon the defendant. If the State were to abandon the prosecution of this matter, that action would undercut the serious nature of the misconduct. Admitting this defendant into PTI would not serve to deter these actions in future offenders. The community needs to be assured that crimes that endanger children will be taken seriously and prosecuted as appropriate. In this type of serious case, formal prosecution should have the required deterrer effect on this defendant and those similarly situated. Admitting this defendant into PTI would undermine the deterrent effect that prosecution is likely to have on future offenders. To permit the defendant to be afforded PTI would be a serious abuse of public trust and would further deprecate the serious nature of the crime that the defendant committed. For these stated reasons, the defendant should not be afforded PTI, and should be prosecuted in the normal course of prosecution.

        *Guideline 4* advises that the defendant need not acknowledge guilt for the most part in order to participate in PTI. Even though the defendant does not normally need to acknowledge guilt, the defendant's attitude can be taken into account. The defendant must assume some responsibility for his conduct in order for PTI to be effective. State v. Randall, 414 N.J. Super. 414, 421-422 (App. Div. 2010) certif. den. 203 N.J. 437 (2010). This defendant does not to take responsibility for his actions and the detrimental consequences that

A. 048

resulted. The defendant fails to show any remorse for his actions, or realize that his actions produced significant trauma in a young victim. Due to the defendant's failure to accept responsibility, the benefit of PTI is not likely to be effective with this defendant. Thus, the defendant should also be rejected from PTI under this *Guideline*.

The State recognizes that the instant matter will likely result in a criminal conviction for the defendant. The State is not unsympathetic to the fact that the defendant lost his employment, and has been rejected by two subsequent potential employers due to this incident. However, the violent and predatory nature of the incident, the trauma that the defendant has caused to the victim, and the lack of remorse from the defendant cannot be undermined. Therefore, the State rejects Mr. Musbach's PTI application.

Respectfully Submitted,

*Tracey L. O'Brien*

Tracey L. O'Brien
Assistant Atlantic County Prosecutor
NJSBN 000102005

cc:  William Polistina, Esq., via ecourts
      David Ruffenach, Assistant Prosecutor, via email
      Grace Dovell-Welch, Assistant Prosecutor, PTI Division, via email
      Lori Morgan, PTI Coordinator, via email
      Michele Baglivo, Sr. Probation Officer, PTI, via email
      Cecilia Medina, Clerk, PTI, via email

**A. 049**

11/13/2020                                                    Transaction Receipt

# Merchant: SEB Realty

7 Johnson Drive
Raritan, NJ 08869                        (856) 784-9501
US

Order Information

Description:            KW-holding fee -apt 4-3
Order Number:                            P.O. Number:
Customer ID:                             Invoice Number:

**Billing Information**                  **Shipping Information**
Elizabeth Musbach                        Elizabeth Musbach
███

                                                    Shipping:         0.00
                                                    Tax:              0.00
                                                    **Total:   USD 500.00**

Payment Information

Date/Time:              13-Nov-2020 13:06:49 PST
Transaction ID:         62671142787
Transaction Type:       Authorization w/ Auto Capture
Transaction Status:     Captured/Pending Settlement
Authorization Code:     09512D
Payment Method:         Visa ███████

**A. 050**

CGPC Solutions
430 Fairmount Ave.
Philadelphia, PA.
19123

RE: John Musbach                                    9/8/2020

To whom it may concern,

John was employed by Computer Guy PC Solutions in 2017, and 2018. During that time, John was professional, and timely. He did a good job. His performance reviews were always top notch. John seemed even tempered, and completely forthcoming about his past. I gave John an opportunity being aware of his past, and he did not let me down. John continued to stay in touch after we stopped working together, and he is eligible for rehire.

Please feel free to reach out to me if you would like to know more about John's work habits. I will vouch for John.

Sincerely,

Scott DeGirolamo
Owner - Computer Guy, and CGPC Solutions

**A. 051**

# JOSEPH R. VIOLA, P.C.

A PROFESSIONAL CORPORATION

1515 MARKET STREET
SUITE 1200
PHILADELPHIA, PA 19102

JOSEPH R. VIOLA

LL.M. (TAXATION)
MEMBER PA & NJ BARS

(215) 854-6310
FAX (215) 854-4091

Email: jrviola@comcast.net

January 13, 2021

Rocco C. Cipparone, Jr., Esquire
Law Offices of Rocco C. Cipparone, Jr.
203-205 Black Horse Pike
Haddon Heights, NJ 08035

> **Re:** **United States of America v. John Michael Musbach**
> **Case No. 20-MJ-5666-KMW-1**
> **United States District Court for the District of New Jersey**

Dear Attorney Cipparone:

As you know, I was retained by your client, John Michael Musbach, to handle the legal work necessary to transfer legal and factual ownership, possession and control of all of Mr. Musbach's financial assets to a Trust created for that purpose so that Mr. Musbach would cease to have access to those financial assets.

I am pleased to report that the process has been successfully completed such that all of Mr. Musbach's financial assets are now owned and exclusively controlled by the John Michael Musbach Trust, EIN ████████, a trust created under and governed by the laws of the State of New Jersey. Mr. Musbach's parents, James and Elizabeth Musbach are the Co-Trustees of the Trust and have sole control of the Trust assets. **John Musbach has no right or ability to access or control any of the funds/assets, only James and Elizabeth can do so.**

The financial assets at issue were a Charles Schwab & Co. Brokerage Account and Ethereum (ETH) cryptocurrency accounts with Kraken, a company based in San Francisco, California, and BlockFi, a company based in Jersey City, New Jersey. The BlockFi account also included a Bitcoin (XBT) component representing interest paid on the Ethereum deposit.

The Charles Schwab assets have been transferred to a Trust Brokerage Account with ████████ Brokerage Services owned by the John Michael Musbach Trust; the Charles Schwab account has been closed. The Kraken and BlockFi assets have been combined and transferred to a ████████ account owned by Co-Trustee Elizabeth Musbach. The Kraken and BlockFi accounts have been closed.

**A. 052**

# JOSEPH R. VIOLA, P.C.
A PROFESSIONAL CORPORATION

**Rocco C. Cipparone, Jr., Esquire**
**Law Offices of Rocco C. Cipparone, Jr.**
**January 13, 2021**
**Page Two**

      In addition to the financial assets enumerated above, Mr. Musbach had conventional checking and savings accounts with ▮▮▮ Bank. Both of those accounts now have a $0.00 balance but have not been closed pending further instructions.

      I will gladly furnish a copy of the Trust Agreement and supporting documentation concerning the asset transfers upon request. I am also available to testify in Court concerning the contents and subject matter of this letter and to submit a formal declaration or certification.

                     Very truly yours,

                     JOSEPH R. VIOLA, P.C.

                     BY:
                     Joseph R. Viola, Esquire

JRV:sm

*A.* **053**

AO 472  (Rev. 11/16)  Order of Detention Pending Trial

# UNITED STATES DISTRICT COURT
### for the
District of New Jersey

| | | | |
|---|---|---|---|
| United States of America | ) | | |
| v. | ) | | |
| JOHN MICHAEL MUSBACH | ) | Case No. | 20-MJ-5666-KMW-1 |
| | ) | | |
| _Defendant_ | ) | | |

## ORDER OF DETENTION PENDING TRIAL

### Part I - Eligibility for Detention

Upon the

    ☑ Motion of the Government attorney pursuant to 18 U.S.C. § 3142(f)(1), or
    ☐ Motion of the Government or Court's own motion pursuant to 18 U.S.C. § 3142(f)(2),

the Court held a detention hearing and found that detention is warranted. This order sets forth the Court's findings of fact and conclusions of law, as required by 18 U.S.C. § 3142(i), in addition to any other findings made at the hearing.

### Part II - Findings of Fact and Law as to Presumptions under § 3142(e)

☐ **A. Rebuttable Presumption Arises Under 18 U.S.C. § 3142(e)(2)** _(previous violator)_: There is a rebuttable presumption that no condition or combination of conditions will reasonably assure the safety of any other person and the community because the following conditions have been met:

    ☐ **(1)** the defendant is charged with one of the following crimes described in 18 U.S.C. § 3142(f)(1):

        ☐ **(a)** a crime of violence, a violation of 18 U.S.C. § 1591, or an offense listed in 18 U.S.C. § 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed; **or**

        ☐ **(b)** an offense for which the maximum sentence is life imprisonment or death; **or**

        ☐ **(c)** an offense for which a maximum term of imprisonment of 10 years or more is prescribed in the Controlled Substances Act (21 U.S.C. §§ 801-904), the Controlled Substances Import and Export Act (21 U.S.C. §§ 951-971), or Chapter 705 of Title 46, U.S.C. (46 U.S.C. §§ 70501-70508); **or**

        ☐ **(d)** any felony if such person has been convicted of two or more offenses described in subparagraphs (a) through (c) of this paragraph, or two or more State or local offenses that would have been offenses described in subparagraphs (a) through (c) of this paragraph if a circumstance giving rise to Federal jurisdiction had existed, or a combination of such offenses; **or**

        ☐ **(e)** any felony that is not otherwise a crime of violence but involves: **(i)** a minor victim; **(ii)** the possession of a firearm or destructive device (as defined in 18 U.S.C. § 921); **(iii)** any other dangerous weapon; or **(iv)** a failure to register under 18 U.S.C. § 2250; **and**

    ☐ **(2)** the defendant has previously been convicted of a Federal offense that is described in 18 U.S.C. § 3142(f)(1), or of a State or local offense that would have been such an offense if a circumstance giving rise to Federal jurisdiction had existed; **and**

    ☐ **(3)** the offense described in paragraph (2) above for which the defendant has been convicted was committed while the defendant was on release pending trial for a Federal, State, or local offense; **and**

    ☐ **(4)** a period of not more than five years has elapsed since the date of conviction, or the release of the defendant from imprisonment, for the offense described in paragraph (2) above, whichever is later.

A. 054

AO 472  (Rev. 11/16)  Order of Detention Pending Trial

☐ **B. Rebuttable Presumption Arises Under 18 U.S.C. § 3142(e)(3)** *(narcotics, firearm, other offenses)*:  There is a rebuttable presumption that no condition or combination of conditions will reasonably assure the appearance of the defendant as required and the safety of the community because there is probable cause to believe that the defendant committed one or more of the following offenses:

    ☐ **(1)** an offense for which a maximum term of imprisonment of 10 years or more is prescribed in the Controlled Substances Act (21 U.S.C. §§ 801-904), the Controlled Substances Import and Export Act (21 U.S.C. §§ 951-971), or Chapter 705 of Title 46, U.S.C. (46 U.S.C. §§ 70501-70508);

    ☐ **(2)** an offense under 18 U.S.C. §§ 924(c), 956(a), or 2332b;

    ☐ **(3)** an offense listed in 18 U.S.C. § 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed;

    ☐ **(4)** an offense under Chapter 77 of Title 18, U.S.C. (18 U.S.C. §§ 1581-1597) for which a maximum term of imprisonment of 20 years or more is prescribed; **or**

    ☐ **(5)** an offense involving a minor victim under 18 U.S.C. §§ 1201, 1591, 2241, 2242, 2244(a)(1), 2245, 2251, 2251A, 2252(a)(1), 2252(a)(2), 2252(a)(3), 2252A(a)(1), 2252A(a)(2), 2252A(a)(3), 2252A(a)(4), 2260, 2421, 2422, 2423, or 2425.

☐ **C. Conclusions Regarding Applicability of Any Presumption Established Above**

    ☐ The defendant has not introduced sufficient evidence to rebut the presumption above, and detention is ordered on that basis. *(Part III need not be completed.)*

    **OR**

    ☐ The defendant has presented evidence sufficient to rebut the presumption, but after considering the presumption and the other factors discussed below, detention is warranted.

### Part III - Analysis and Statement of the Reasons for Detention

After considering the factors set forth in 18 U.S.C. § 3142(g) and the information presented at the detention hearing, the Court concludes that the defendant must be detained pending trial because the Government has proven:

    ☒ By clear and convincing evidence that no condition or combination of conditions of release will reasonably assure the safety of any other person and the community.

    ☒ By a preponderance of evidence that no condition or combination of conditions of release will reasonably assure the defendant's appearance as required.

In addition to any findings made on the record at the hearing, the reasons for detention include the following:

    ☒ Weight of evidence against the defendant is strong
    ☐ Subject to lengthy period of incarceration if convicted
    ☐ Prior criminal history
    ☒ Participation in criminal activity while on probation, parole, or supervision
    ☐ History of violence or use of weapons
    ☐ History of alcohol or substance abuse
    ☐ Lack of stable employment
    ☐ Lack of stable residence
    ☐ Lack of financially responsible sureties

A. 055

AO 472  (Rev. 11/16)  Order of Detention Pending Trial

- ☒ Lack of significant community or family ties to this district
- ☐ Significant family or other ties outside the United States
- ☐ Lack of legal status in the United States
- ☐ Subject to removal or deportation after serving any period of incarceration
- ☐ Prior failure to appear in court as ordered
- ☐ Prior attempt(s) to evade law enforcement
- ☐ Use of alias(es) or false documents
- ☐ Background information unknown or unverified
- ☐ Prior violations of probation, parole, or supervised release

OTHER REASONS OR FURTHER EXPLANATION:

**Part IV - Directions Regarding Detention**

The defendant is remanded to the custody of the Attorney General or to the Attorney General's designated representative for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal.  The defendant must be afforded a reasonable opportunity for private consultation with defense counsel.  On order of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility must deliver the defendant to a United States Marshal for the purpose of an appearance in connection with a court proceeding.

Date: _August 20 2020_ _____ _____
                                                    United States Magistrate Judge

A. 056

| | |
|---|---|
| **From:** | Nicole Ramos |
| **To:** | Rocco Cipparone |
| **Subject:** | RE: USAv. Musbach 20-JM-5666 |
| **Date:** | Tuesday, February 2, 2021 10:25:10 AM |

Hi!  Unfortunately, we have an issue with the Zoom  recording for 8/20/20.  Another Courtroom Deputy filled in for me that day because I was on vacation.  That person's computer crashed and it had to be wiped clean, so there is no recording available from that day.  The Court's IT Dept. has been investigating and says there is no way to recover it.  I only have the 1/25/21 recording.

**From:** Rocco Cipparone ███████████████████████
**Sent:** Monday, February 1, 2021 9:36 PM
**To:** Nicole Ramos ███████████ @njd.uscourts.gov>
**Subject:** Re: USAv. Musbach 20-JM-5666

==**CAUTION - EXTERNAL:**==

Sorry there was a typo in the below email regarding the date of the second hearing. I meant Jan 25, 2021. So to recap, the dates are Aug 20, 2020 and Jan 25, 2021, and the 3 day turnaround is requested.  Thanks.

Rocco Cipparone

**From:** Rocco Cipparone ███████████████████████
**Sent:** Monday, February 1, 2021 9:32 PM
**To:** Nicole Ramos
**Subject:** USAv. Musbach 20-JM-5666

Dear Ms. Ramos:

As discussed earlier today I would like to order the transcripts of the two detention hearings conducted in the above-referenced case which occurred on the following dates: August 20, 2020 and January 25, 2020. I would like the transcripts on the 3 day turn around schedule. Please confirm receipt and if you need additional information please let me know. Thanks.

Rocco Cipparone

==**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.==

**A. 057**